**SCANWELL LABORATORIES, INC.,**
Appellant,

v.

**John H. SHAFFER, Administrator (Acting) of The Federal Aviation Administration, et al.**

No. 22863.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 3, 1969.

Decided Feb. 13, 1970.

Petition for Rehearing Denied May 7, 1970.

Mr. John M. Calimafde, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Paul H. Blaustein, New York City, and James W. Dent, Washington, D. C., were on the brief, for appellant.

Mr. Michael C. Farrar, Atty., Dept. of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for government appellees. Mr. David G. Bress, U. S. Atty., at the time the record was filed, and Mrs. Ellen Lee Park, Asst. U. S. Atty., also entered appearances for government appellees.

Mr. David V. Anthony, Washington, D. C., for appellee, Cutler-Hammer, Inc.

Before BAZELON, Chief Judge, and TAMM and MacKINNON,* Circuit Judges.

TAMM, Circuit Judge:

This is an appeal from an order entered in the district court dismissing the appellant's complaint for lack of jurisdiction. The district court was mislead by precepts which on careful examination are more rhetorical than guiding. The suit was dismissed on the ground that plaintiff lacked standing to sue; this appeal raises important questions concerning that concept.

The transaction involved resulted from the issuance by the Federal Aviation Administration of an invitation for bids (IFB) for instrument landing systems to be installed at airports to guide aircraft along a predetermined path to a landing approach. Such systems are designed to make the approach of aircraft to airports safer, a result which the FAA sought to attain by carefully circumscribing the criteria for bids in such a way as to preclude bids from producers who did not already have operational systems installed and tested in at least one location.[1]

When the bids for the instrument landing systems were opened, it was discovered that appellant's was the second lowest bid. The lowest bid was entered by Airborne Instrument Laboratory, a division of Cutler-Hammer, Inc. Appellant alleged in the district court that appellee Cutler-Hammer's bid was non-responsive to the IFB in that Cutler-Hammer did not have a system installed in one location, nor did it have a certificate of performance based on an FAA flight check. Appellant therefore sought to have the action of the FAA in granting the contract to defendant Cutler-Hammer de-

---

* Judge MacKinnon did not participate in the disposition of this case.

1. The invitation for bids provided: "To be responsive to this request, the contractor shall submit evidence that an identical equipment complement as that proposed for this procurement has previously been installed in at least one location and has achieved at least Category 1 performance as certified by an FAA flight check. * * * This shall be evidenced by the submission of a certification from the flight inspection source." (App. 6a, Annex p. 6.)

clared null and void as a violation of statutory provisions controlling government contracts and the regulations promulgated thereunder.

The Code of Federal Regulations provides:

> To be considered for award, *a bid must comply in all material respects with the invitation for bids* so that, both as to the method and timeliness of submission and as to the substance of any resulting contract, all bidders may stand on an equal footing and the integrity of the formal advertising system may be maintained.

41 C.F.R. § 1–2.301(a) (1969) (emphasis added). The regulations go on to state that:

> *Any bid which fails to conform to the essential requirements of the invitation for bids,* such as specifications, delivery schedule or permissible alternates thereto, *shall be rejected as non-responsive.*

41 C.F.R. § 1–2.404–2(a) (1969) (emphasis added).

Appellant urges that it can seek review of a contract award which is in violation of the regulations governing the issuance thereof by virtue of section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (Supp. IV 1965–68), which provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

Appellant asserts that the action of the FAA in granting this contract to an allegedly non-responsive bidder is arbitrary, capricious and a violation of the statutory provisions governing contracting, and that it can therefore be set aside under section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706 (Supp. IV 1965–68).

## I.  STANDING TO SUE

Whether a frustrated bidder for a government contract has standing to sue, alleging illegality in the manner in which the contract was let, is a question of major importance and can be dealt with only on the basis of a thorough review of the law of standing. Much that can be easily recognized in this area cannot be defined except with the greatest difficulty.

Standing has been called one of the most amorphous concepts in the entire domain of the public law. That this statement is undoubtedly true is evidenced by the mental gymnastics through which the courts have passed in determining standing issues. Professor Davis describes the circuity of reasoning which surrounds these issues as follows:

> A plaintiff who seeks to challenge governmental action always has standing if a legal right of the plaintiff is at stake. When a legal right of the plaintiff is not at stake, a plaintiff sometimes has standing and sometimes lacks standing. Circular reasoning is very common, for one of the questions asked in order to determine whether a plaintiff has standing is whether the plaintiff has a legal right, but the question whether the plaintiff has a legal right is the final conclusion, for if the plaintiff has standing his interest is a legally-protected interest, and that is what is meant by a legal right.[2]

The law of standing as developed by the Supreme Court has become an area of incredible complexity. Much that the Court has written appears to have been designed to supply retrospective satisfaction rather than future guidance. The Court has itself characterized its law of standing as a "complicated specialty of federal jurisdiction." United States ex rel. Chapman v. FPC, 345 U.S. 153, 156, 73 S.Ct. 609, 97 L.Ed. 918 (1953). One cannot help asking why this should be true. Is there something innately different about the standing questions which arise in the state courts which

---

2.  3 K. Davis, Administrative Law Treatise 217 (1958).

862

makes them easier of solution than their federal counterparts? Or is it true, as Professor Davis has stated, that "[t]he difference is that the federal courts have invented a law of standing that is too complex for the federal courts to apply consistently, whereas the state courts, relatively speaking, have perceived the merits of the simple proposition that those who are in fact adversely affected should be allowed to challenge"?[3]

In order to answer the question whether there is a valid basis for the complexities surrounding the federal standing criteria, it will be useful to consider the early landmark cases in this area.

## A. *The Early Cases*

The most famous early cases denying standing were the companion cases of *Massachusetts v. Mellon* and *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), in which the Court said that the Commonwealth could not sue because its own rights were not involved, and that the individual taxpayer could not sue because the interests of the taxpayer are so "comparatively minute and indeterminable" and that the taxpayer's contentions, even if proved, would have too "remote, fluctuating and uncertain" an effect on payments out of the Treasury. 262 U.S. 487, 43 S.Ct. 597, 67 L.Ed. 1078. (The overruling of *Frothingham* in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), will be discussed *infra*.) Thus the initial criterion for establishing standing to sue was a showing that a legal right of the plaintiff was violated. As the Court pointed out in Edward Hines Yellow Pine Trustees v. United States, 263 U.S. 143, 148, 44 S.Ct. 72, 68 L.Ed. 216 (1923), the plaintiff "must show also that the order alleged to be void subjects them to legal injury, actual or threatened."

A subsequent opinion by Mr. Justice Brandeis which clarified that criterion was written the following year in The Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924). Standing was upheld therein for six competitors to challenge the validity of an Interstate Commerce Commission decision allowing the New York Central Railroad to acquire an independent terminal railroad in Chicago. The decision was attacked on the ground that there was no evidence to support a finding that the acquisition would be in the public interest as required by the statute. The Court distinguished its prior decision by stating that:

This loss is not the incident of more effective competition. Compare Edward Hines [Yellow Pine] Trustees v. United States, 263 U.S. 143, 148 [44 S.Ct. 72, 68 L.Ed. 216]. It is injury inflicted by denying to the plaintiffs equality of treatment * * *. By reason of [the Interstate Commerce Act] the plaintiffs, being competitors of the New York Central and users of the terminal railroads theretofore neutral, have a special interest in the proposal to transfer the control to that company.

264 U.S. at 267, 44 S.Ct. at 320. Professor Jaffe has construed this case to mean that:

Standing * * * is made to rest on a determination that an interest intended by statute to be protected has been denied that protection. It should be stated somewhat more sharply just what this did and did not mean in the context. It did not mean that there was a right that competition not be diminished. The plaintiff could not win simply by showing such diminution. It did mean that the agency was required by the statute to have regard to competition as one factor in its decision; that it must, if it disregards the effect on competition, give a reasoned explanation. It is in this sense that the "legal right" criterion is most appropriately applied as a generalizing concept to administrative law.[4]

3. 3 K. Davis, *supra* note 2, at 291–292.

4. L. Jaffe, Judicial Control of Administrative Action 507–508 (1965).

A clear statement of the bases of this principle is found in the Court's subsequent opinion in Tennessee Elec. Power Co. v. TVA, 306 U.S. 118, 137–138, 59 S.Ct. 366, 83 L.Ed. 543 (1939):

> The appellants invoke the doctrine that one threatened with direct and special injury by the act of an agent of the government which, but for the statutory authority for its performance, would be a violation of his legal rights, may challenge the validity of the statute in a suit against the agent. *The principle is without application unless the right invaded is a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.* (Emphasis added.)

This case held that a private electric producer did not have standing to challenge governmental subsidy of competition. This line of cases securely entrenched the legal right doctrine in the federal law of standing. Inconsistencies resulting from this doctrine are readily apparent.[5]

The need for a broader criterion was met by the decision of the Court in FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), which is the leading case on the "person aggrieved" criterion for standing to sue. With this case the broader concept of standing gained tremendous ground. In *Sanders* the Court granted standing to a plaintiff who could not demonstrate an infringement of a legally protected right. This the Court did through its interpretation of the Communications Act of 1934, saying of section 402(b) (2) thereof:

> [Congress] may have been of the opinion that one likely to be financially injured by the issue of a license would be the only person having a sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission in granting the license. It is within the power of Congress to confer such standing to prosecute an appeal.

309 U.S. at 477, 60 S.Ct. at 698.

The only apparent difference between *Tennessee Electric Power* and *Sanders* is that in *Tennessee Electric* there was no statutory provision granting judicial review to the courts, whereas in the latter case there was such an express provision. If this is true, the "legal right" doctrine is certainly dead wherever there is express "person aggrieved" language in the relevant statute, and there is a strong argument for the proposition that the same result should obtain when section 10 of the Administrative Procedure Act applies.[6]

At this point in the development of the law of standing the Court evidently perceived the need to promulgate a standard which would provide redress for legitimate grievances in cases in which the plaintiff asserted a position which protected a public rather than a specific private interest; for this purpose it was recognized that the legal right doctrine was needlessly harsh and restrictive. Thus the Court made clear in Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 14, 62 S.Ct. 875, 86 L.Ed. 1229 (1942), that "these private litigants have standing only as representatives of the public interest." In using these words to find that a radio station which would in all probability suffer economic injury if the FCC granted a rival license was a person aggrieved under the statute, the Court opened the door to the next logical step, which Judge Frank took the following year.

In Associated Industries of New York State, Inc. v. Ickes, 134 F.2d 694, 704

5. *See, e. g.,* Alexander Sprunt & Son, Inc. v. United States, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832 (1930), a case in which Mr. Justice Brandeis held that appellant had standing to be a party to an administrative proceeding before the ICC because it had a "distinct interest in the proceeding," but that it did not have standing to appeal the Commission's order because it was not "subjected to or threatened with any legal wrong." 281 U.S. at 254, 257, 50 S.Ct. at 318.

6. *See* 3 K. Davis, *supra* note 2, at 221.

(2d Cir.), *vacated as moot,* 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), Judge Frank, after emphasizing the above-quoted language from *Scripps-Howard,* said:

> [W]e believe that the usual "standing to sue" cases can be reconciled with the Sanders and Scripps-Howard cases, as follows: While Congress can constitutionally authorize no one, in the absence of an actual justiciable controversy, to bring a suit for the judicial determination either of the constitutionality of a statute or the scope of powers conferred by a statute upon government officers, it can constitutionally authorize one of its own officials, such as the Attorney General, to bring a proceeding to prevent another official from acting in violation of his statutory powers; for then an actual controversy exists, and the Attorney General can properly be vested with authority, in such a controversy, to vindicate the interest of the public or the government. Instead of designating the Attorney General, or some other public officer, to bring such proceedings, Congress can constitutionally enact a statute conferring on any non-official person, or on a designated group of non-official persons, authority to bring a suit to prevent action by an officer in violation of his statutory powers; for then, in like manner, there is an actual controversy, and *there is nothing constitutionally prohibiting Congress from empowering any person, official or not, to institute a proceeding involving such a controversy, even if the sole purpose is to vindicate the public interest.* Such persons, so authorized, are, so to speak, private Attorney Generals. (Emphasis added.)

This court has read the above language with approbation. In National Coal Ass'n v. FPC, 89 U.S.App.D.C. 135, 191 F.2d 462 (1951), Judge Bazelon, speaking for the court, said:

> We agree with the rationale which [the *Ickes*] case draws from the Supreme Court's decisions in the San-ders and Scripps-Howard cases: " * * * one threatened with financial loss through increased competition resulting from a Commission's order is 'aggrieved.' * * * The " 'person aggrieved' review provision [is] a constitutionally valid statute authorizing a class of 'persons aggrieved' to bring suit in a Court of Appeals to prevent alleged unlawful official action in order to vindicate the public interest, although no personal substantive interest of such persons had been or would be invaded. * * * "

89 U.S.App.D.C. 137, 191 F.2d 464–465.

In essence this is precisely what the appellant sought to do in the case at bar; there is no right in Scanwell to have the contract awarded to it in the event the district court finds illegality in the award of the contract to Cutler-Hammer. Thus the essential thrust of appellant's claim on the merits is to satisfy the public interest in having agencies follow the regulations which control government contracting. The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a "private attorney general."

For this reason one of the things implicit in Judge Frank's statement strikes us as being of the utmost importance: When the Congress has laid down guidelines to be followed in carrying out its mandate in a specific area, there should be some procedure whereby those who are injured by the arbitrary or capricious action of a governmental agency or official in ignoring those procedures can vindicate their very real interests, while at the same time furthering the public interest. These are the people who will really have the incentive to bring suit against illegal government action, and they are precisely the plaintiffs to insure a genuine adversary case or controversy. As the Supreme Court has recently said, the need is for parties

with "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination" of complex legal issues. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

## B. *The Administrative Procedure Act*

The law of standing was greatly modified by the passage of the Administrative Procedure Act, 5 U.S.C. §§ 551–706 (Supp. IV 1965–68), section 10 of which states that:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702 (Supp. IV 1965–68).

It has been forcefully argued that the legislative history of this section can be reasonably interpreted to support the "aggrieved in fact" theory because that language appears in the reports of both the Senate and House committees; in each the statement is found that "[t]his subsection confers a right of review upon any person adversely affected *in fact* by agency action or aggrieved within the meaning of any statute." [7] This language did not appear in the statute itself, however, and the Attorney General stated that the provision was reflective of existing law. [8]

In order to meet the objections of various parties to language in the statute, the Senate Report which accompanied the Act stated that:

> (1) One agency objects to the recognition of a right of review in public contract and other cases where Congress has not specifically provided for judicial review. But * * * the so-called nonstatutory or common-law type of review was recognized by the Attorney General's Committee as properly obtaining wherever special statutory review is not provided by Congress and legislation does not indicate that judicial review is precluded or withdrawn. The exceptions stated in the introductory clause of section 10 appear to set forth the proper type of issues not subject to judicial review. *If a party can show that he is "suffering legal wrong" as provided in subsection (a), he should have some means of judicial redress.*

S. Doc. No.248, 79th Cong., 2d Sess. 37–38 (1946) (emphasis added).

The view that the Act was reflective of existing law was supported by the opinion of this court in Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924 (D.C.Cir.), cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L. Ed. 780 (1955), in which Judge Washington stated that the section was declaratory of existing law. The weight of that decision has been greatly reduced, however, by the decision of the Supreme Court in Hardin v. Kentucky Utilities Co., 390 U.S. 1, 7, 88 S.Ct. 651, 19 L.Ed. 2d 787 (1968), in which the Court held that there was no requirement for a specific statutory grant of standing in actions by competitors to enforce statutes protecting competitive interests. The interpretation of the *McKay* case is further weakened by the language of the Supreme Court in Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), in which Mr. Justice Harlan said for the Court:

> [A] survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off *unless there is persuasive reason to believe that such was the purpose of Congress.* * * * Early cases in which this type of judicial review was entertained, *e. g.,* Shields v. Utah Idaho Central R. Co., 305 U.S. 177 [59 S.Ct. 160, 83 L.Ed. 111]; Stark v. Wickard, 321 U.S. 288, [64 S.Ct. 559,

---

7. S. Doc. No. 248, 79th Cong., 2d Sess. 212, 276 (1946) (emphasis added).

8. *Id.* at 310.

88 L.Ed. 733], have been reinforced by the enactment of the Administrative Procedure Act, which embodies the basic presumption of judicial review to one "suffering legal wrong because of agency action * * *." The legislative material elucidating that seminal act manifests a congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Administrative Procedure Act's "generous review provisions" must be given a "hospitable" interpretation. * * * [I]n Rusk v. Cort, [369 U.S. 367, 82 S.Ct. 787, at 794, 7 L.Ed.2d 809 (1962)] * * * at 379–380, the Court held that *only upon a showing of "clear and convincing evidence" of a contrary legislative intent should the courts restrict access to judicial review.* (Emphasis added.)

There is no evidence of a contrary legislative intent which affects the appellant's position in the current case. If anything, the legislative intent with respect to the field of government contracting in general seems to run in precisely the opposite direction, that is, in favor of review.

Appellee makes much of the Supreme Court's decision in Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), in which the Public Contracts Act was interpreted to be an enactment for the protection of the government rather than for those contracting with the government. The plaintiff in that case was therefore denied standing to secure review of wage determinations allegedly arrived at as a result of erroneous statutory interpretation.

It must be remembered that *Perkins* was decided during the heyday of the legal right doctrine, and before the passage of the Administrative Procedure Act. The Court therefore followed the reasoning of its earlier cases in declaring:

> We are of opinion that no legal rights of respondents were shown to have been invaded or threatened in the complaint upon which the injunction * * * was based * * *. Respondents, to have standing in court, must show an injury or threat to a particular right of their own, as distinguished from the public's interest in the administration of the law.

310 U.S. at 125, 60 S.Ct. at 875. Professor Davis has very discerningly seen the fallacy of the Court's thinking in this decision and has devised a more logical and more consistent basis for viewing such situations:

> What the court did not inquire into in the Lukens opinion is why the companies which are adversely affected by the asserted misinterpretation of the statute should not be enlisted as natural law enforcers, whether or not a legal right of the companies is violated. The opinion was written in terms of what "the Government" may do in making contracts; a more refined view would be that government officers were making contracts on behalf of the government, that Congress is also a participant in the exercise of the government's proprietary functions, and that the most practicable way to keep the government's contracting officers within their statutory powers is by letting complainants like those in the Lukens case obtain judicial review of the officers' action.[9]

This is a powerful argument for allowing the plaintiff in the current case the requisite standing to challenge the governmental action of which it complains. Regardless of the merits of plaintiff's case, it should be granted the right, if possible, to make a prima facie showing that the government's agents did in fact ignore the Congressional guidelines in the manner in which they handled the granting of the contracts. If there is arbitrary or capricious action on the part

9. 3 K. Davis, *supra* note 2, at 220.

of any contracting official, who is going to complain about it, if not the party denied a contract as a result of the alleged illegal activity? It seems to us that it will be a very healthy check on governmental action to allow such suits, at least until .or unless this country adopts the *ombudsman* system used so successfully as a watchdog of government activity elsewhere.

Appellee's reliance on *Perkins* is ill founded. In 1952 the Walsh-Healy Public Contracts Act was amended; during floor debate on the Fulbright Amendment, 66 Stat. 308, 41 U.S.C. § 43a (1964), its proponent said:

> Mr. FULBRIGHT. * * * There has been no reasonable means by which interpretations might be challenged. It was tried in the Lukens steel case, in which it was held that the parties seeking to challenge the interpretation had no standing in court to do so. *It is our purpose, by this amendment, to overturn that decision.*

> Mr. SALTONSTALL. So, *the amendment* of the Senator from Arkansas, we hope, *will provide a fairer procedure than the procedure now in effect.*

> Mr. FULBRIGHT. *That is correct. That is the intention.* It is simply intended to give a judicial review of the questions referred to by the Senator from Rhode Island, and others which may arise.

> \* \* \* \* \* \*

> Mr. PASTORE. *I was hoping that the author of this amendment would really give a liberal construction as to what might be meant by "an aggrieved person." I think I understand the Senator correctly, that anyone who feels himself aggrieved, even though he may not be directly connected with the particular case, might go to court and have the question determined by the court upon review.*

> Mr. FULBRIGHT. The Senator gets into a very technical question, there, as to whether there is a controversy involved, under the Constitution.

I do not think that I could shed much light upon that. But *that matter would be submitted to the court for decision as to whether there was a sufficient set of circumstances to support a case.*

98 Cong. Rec. 6531 (1952) (emphasis added). This somewheat lengthy excerpt from the Congressional Record is made both to show that the basic approach of the Supreme Court in the *Perkins* case has been legislatively reversed by the Congress and to demonstrate the Congressional intent that certain matters arising under the Public Contracts Act will be given specific judicial review by Congressional fiat. Given this statement of intent on the part of the Congress, can it be said that to grant standing to the plaintiffs in the current cases would go against the will of the Congress? Does not this phraseology constitute a liberation from the bonds of *stare decisis*? We hardly think a contrary argument can stand in the face of the quoted language. Clearly the Congress favors review for those who are likely to be injured by illegal agency action in the context of government contracting.

This court had occasion to review the amendments to the Walsh-Healy act in Wirtz v. Baldor Elec. Co., 119 U.S.App. D.C. 122, 337 F.2d 518 (1963), in which it was said:

> It is clear that the statutory language saying that persons adversely affected shall be deemed to include "any manufacturer", et cetera, was inserted for the purpose of specifically negating the Supreme Court's holding in Perkins v. Lukens Steel, [310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108] * * * and was not intended to confer standing upon every manufacturer or dealer in an industry, whether or not he was adversely affected * * *. Thus, *the amendment was intended to bestow litigable rights upon those who need "protection against arbitrary actions," i. e., as the statute says, those adversely affected or aggrieved. Manufacturers and sup-*

*pliers were specifically mentioned in the statute in order to reject clearly the Supreme Court's holding that notwithstanding an adverse effect the parties had no litigable rights.*

119 U.S.App.D.C. at 136–137, 337 F.2d at 532–533 (emphasis added).

The court found this to be the purpose of the amendment largely on the basis of Senator Fulbright's statement that:

The second part of my amendment provides for judicial review * * * as a protection against arbitrary actions of the Secretary of Labor. It is made necessary by the decision of the Supreme Court in the Lukens Steel case. This case held that courts have no jurisdiction since no rights of the contractors were involved—doing business with the Government was a privilege and not a right.

98 Cong. Rec. 6246 (1952).

This portion of the legislative history of the amendments to the Public Contracts Act shows without question that there is not only no Congressional intent to limit review under that Act but rather that there is actually an affirmative intent of the legislature to grant review in circumstances which warrant it. Indeed, one of the primary effects of the Fulbright Amendment was to make the Administrative Procedure Act specifically applicable.

The trend of cases, both in this Circuit and in the Supreme Court, indicates that allegations of illegality such as those made by the appellant in the current case are a sufficient basis for standing. This court had occasion to review the application of the Public Contracts Act in Friend v. Lee, 95 U.S.App.D.C. 224, 221 F.2d 96 (1955), and delimited standing under its provisions in the following terms:

Plaintiff contends that the contract between the defendants and Avis is illegal on the ground that it was entered into without previous advertising for proposals, as 41 U.S.C.A. § 5 requires. But assuming *arguendo*

that the statute is applicable and may have been violated, plaintiff, nevertheless, has no standing to sue to invalidate the contract. Statutes regulating the contracting procedures of officers of the Federal Government are enacted solely for the benefit of the Government and confer no enforceable rights upon persons dealing with it. Perkins v. Lukens Steel Co., 1940, [310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108] * * * In consequence, plaintiff cannot contest the award of the contract to Avis, either as a bidder or in his capacity as a citizen generally. * * *

* * * * * *

* * * Contracting officers of the Federal Government have the duty to select the contract most advantageous to the Government, and advantage is not measured exclusively in terms of price; it includes other factors such as judgment, skill, ability, capacity and integrity. * * * The final selection of a contractor involves discretion and is not subject to review by the judicial branch of the Government. * * * Since plaintiff has alleged no facts which tend to show that defendants have through conspiracy, fraud, malice or coercion abused their discretion in awarding the contract, Alabama Power Co. v. Ickes, 1938, [302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374] * * * does not suggest a different conclusion. * * *

* * * * * *

We do not need to determine for the purposes of the instant case whether plaintiff has standing to sue under Section 10 of the Administrative Procedure Act * * * as a person suffering a legal wrong, i. e., the arbitrary destruction of his business, or whether the court may proceed in the exercise of its general equitable powers. *Suffice it to say, that where, as here, there is a prima facie showing of arbitrariness on the part of Government officials in regulatory action taken by them, sufficient to threaten substantial injury to the party af-*

*fected, the injured party is entitled to be heard.*[10]

95 U.S.App.D.C. at 227–229, 221 F.2d at 100–102 (emphasis added). This case is clearly on point and, contrary to appellees' arguments, supports in very explicit terms the position of the appellant.

It is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties. It is also incontestible that that discretion may not be abused. Surely there are criteria to be taken into consideration other than price; contracting officers may properly evaluate those criteria and base their final decisions upon the result of their analysis. They may not base decisions on arbitrary or capricious abuses of discretion, however, and our holding here is that one who makes a prima facie showing alleging such action on the part of an agency or contracting officer has standing to sue under section 10 of the Administrative Procedure Act.

We recently held that a party who submitted a sealed bid for the purchase of oil leases could challenge the grant of the leases to a bidder whose documents were not signed. Superior Oil Co. v. Udall, 133 U.S.App.D.C. 198, 409 F.2d 1115 (1969). It is noted in that case that the Comptroller General has said that:

> "* * * *when a bid is nonresponsive in a material respect, it cannot be corrected even though the nonrespon-*

*siveness may be due to mistake or oversight."*

(133 U.S.App.D.C. at 203, 409 F.2d at 1120; emphasis in original.) In allowing that suit without denying standing to Superior Oil because it was a competitive bidder for a government contract, the court impliedly held that such persons have standing to sue in the event the contract is illegally awarded. This case is clearly on point and materially assists the appellant's case. More recent statements of this court which specifically relate to the standing issue are also relevant.

Subsequent to the *Superior Oil* decision this court had the opportunity to review important questions of standing in National Ass'n of Securities Dealers, Inc. v. SEC, 136 U.S.App.D.C. 241, 420 F.2d 83 (1969), petition for cert. filed. 38 U.S.L.W. 3185 (Nov. 18, 1969). Although the court could not agree in that case on the precise basis for granting standing to the plaintiffs it stated in the brief *per curiam* portion of the opinion that "[w]hile a majority of the court has reservations about standing, these doubts have been resolved in favor of reaching the merits in cases of this consequence." 136 U.S.App.D.C. at 242, 420 F.2d at 84. Here again is a statement, this time by this very court, which indicates that the criteria for standing in the federal system are so amorphous that even the judges of the United States Courts of Appeals are in doubt as to the proper guidelines to be followed. We think it time that such doubts were re-

---

10. This somewhat lengthy recital of the *Friend* opinion is necessary to demonstrate the marked difference between that case and the present case. The point made in *Friend* is that the selection of people with whom the government will enter into a contract is a matter of discretion when it involves considerations of price, judgment, skill, ability, capacity and integrity, and we agree with that analysis. The point on which we distinguish that case is that here we have a situation in which explicit requirements of the bid were waived by the agency; this results in an allegation of arbitrary and capricious misconduct, an allegation not made in *Friend*. Further, in the quoted excerpt from the opinion which dealt with the operation of the airport, as opposed to the granting of the concession, the court pointed out that a prima facie showing of arbitrariness would be sufficient to entitle the plaintiff to a hearing, even in the absence of the specific language of the Administrative Procedure Act. What we do here merely points out that with a prima facie showing of abuse of discretion and with the language of the Administrative Procedure Act in full application, a plaintiff does have standing to sue.

solved in favor of hearing cases in which the public interest demands a hearing on the merits. As Chief Judge Bazelon said in his concurring opinion (136 U.S. App.D.C. at 254, 420 F.2d at 96):

the basic justification for entertaining competitors' suits to challenge administrative action as statutory aggrieved parties, intended beneficiaries, or licensees is to vindicate a public interest, and not a private right. The absence of a statutory aid to standing in this case is adventitious, and I would grant appellants standing to assert the public interest without it.

The issue of standing to sue was next raised in this court in Air Reduction Co., Inc. v. Hickel, 137 U.S.App.D.C. 24, 420 F.2d 592 (1969). In that case the court specifically met the contention that the regulations of the Secretary of the Interior are beyond challenge even if not Congressionally authorized, and granted standing to a competitor to protest regulations applicable to purchases of helium by contractors of federal agencies as being beyond the power of the Secretary. This case is analogous to the present case in which the appellant seeks to challenge an exercise of discretion on the part of a government contract official as being beyond his statutory authority. In Air Reduction the court was not called upon to pass on the standing of the competitor under the Administrative Procedure Act. Rather, in that case the appellee was held to be specifically within the scope of the court's ruling in Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964), which held that standing exists in one who currently has a beneficial business relationship for supplying the needs of the government to challenge the unlawful termination of that relationship. This case expands on the logic of that decision; here we hold that one who has a prospective beneficial relationship has standing to challenge the illegal grant of a contract to another, which is

precisely what this court did in Superior Oil v. Udall, *supra* p. 869.

Climaxing the growing trend of cases in this jurisdiction which have expanded the criteria for granting standing to sue by virtue of a recognition of the logic of the aggrieved-in-fact criterion is the recently decided case of Curran v. Laird, 136 U.S.App.D.C. 280, 420 F.2d 122 (1969) (*en banc*). Although the majority in that case found that the appellant had standing because of a legally protected right under the Merchant Marine Act of 1936 and the Cargo Preference Act, which evidenced a statutory intent to protect American seamen against foreign competition, the majority did say that:

Obviously no simple touchstone can be provided for determination of standing questions. Each case turns on the nature of the parties, the grievances and the statutory provisions involved. However, it is clear that with the approach charted in *Abbott Laboratories*, a person aggrieved in fact may properly invoke not only the letter of the Administrative Procedure Act and its "generous" review provisions, but *a broad conception that Congress is "hospitable" to the maintenance of complaints against officials charged with disregarding its substantive mandate.*

136 U.S.App.D.C. at 284, 420 F.2d at 126 (emphasis added).

There are no Supreme Court cases which go directly to confirming an expanded role for section 10 of the Administrative Procedure Act in this context. However, Professor Davis has pointed out several recent Supreme Court cases which find standing simply on the basis that the plaintiff has suffered a "palpable injury." [11]

In Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), for example, publishers of books discontinued by wholesalers at the admonition of defendant Rhode Island Commission to Encourage Morality in

11. 3 K. Davis, *supra* note 2, (Supp. 1965 at 51–52).

Youth were allowed to sue, the Court saying that:

> [P]ragmatic considerations argue strongly for the standing of publishers in cases such as the present one. The distributor who is prevented from selling a few titles is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights. The publisher has the greater economic stake, because suppression of a particular book prevents him from recouping his investment in publishing it. Unless he is permitted to sue, infringements of freedom of the press may too often go unremedied.

372 U.S. at 65 n. 6, 83 S.Ct. at 636 n. 6.

The Court also allowed suit in Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961), on the ground of palpable injury to the plaintiff, a public school teacher who was allowed to sue for an injunction and declaratory judgment that a loyalty oath was unconstitutionally vague. As Professor Davis has pointed out, the holding of that case is clearly inconsistent with the language of Tennessee Electric Power Co. v. TVA, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543, *supra* p. 863, which held that one threatened by injury from governmental action could not challenge that action "unless the right invaded is a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." It has been suggested that such a provision has always been unsound and is no longer valid in light of the recent trend of cases.[12]

The final case cited which rests upon a finding of a "palpable injury" but nothing more is City of Chicago v. Atchison, Topeka & Santa Fe R. Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958). In that case the Court said that "[i]t is enough, for purposes of standing, that we have an actual controversy before us in which [the plaintiff] has a direct and substantial personal interest in the outcome." 357 U.S. at 83, 78 S.Ct. at 1067. This holding is also obviously inconsistent with the holding in *Tennessee Electric Power Co.*

It may well be argued that the Supreme Court has applied this broadened theory of standing only in situations in which the plaintiff had a constitutional right which was being infringed. It will therefore be argued that these decisions are quite narrow, as is the decision in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), although this decision has been touted as the case which will lead to the downfall of traditional notions of standing. *Flast,* which overrules, at least in part, Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), does rest on a narrow and carefully devised "nexus" between two constitutional provisions:

> [W]e hold that a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power.

392 U.S. at 105–106, 88 S.Ct. at 1955. In order to meet this nexus the taxpayer must establish his status and the type of legislation which is being challenged on the one hand, and on the other he must allege a violation of a constitutional provision which specifically limits the authority under which the challenged legislation was passed. Obviously the precise holding of this case is very narrow, but it does point the direction through a careful delineation of the issues properly raised by standing questions. Thus the Court pointed out that:

> Despite the complexities and uncertainties, some meaningful form can be given to the jurisdictional limitations placed on federal court power by the concept of standing. *The fundamental aspect of standing is that it focuses on the party seeking to get his*

---

12. 3 K. Davis, *supra* note 2, at 255.

*complaint before a federal court and not on the issues he wishes to have adjudicated.*

392 U.S. at 99, 88 S.Ct. at 1952 (emphasis added). The Court went on to say that the principal question is whether there is a "proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." *Id.* at 100, 88 S.Ct. at 1952. Thus, even though a party may have standing, the courts will sometimes be forced to decline to pass on his request for review because the subject matter is not properly reviewable. The Court therefore concluded that:

> [I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.

*Id.* at 101, 88 S.Ct. at 1953.

It seems clear to us that, although this language was used in the context of a case deciding constitutional issues, it addresses itself to situations in which no constitutional question may be presented. A person injured by governmental activity which goes to non-constitutional areas of his well-being is just as interested in judicial review of that activity as one whose constitutional rights are being trammeled, and we perceive no logical reason for denying standing to one whose rights in the latter area are denied while granting standing to one who challenges activity which infringes rights in the former area.

Thus, in spite of the fact that the Supreme Court has not yet chosen to hold that the Administrative Procedure Act applies to all situations in which a party who is in fact aggrieved seeks review, regardless of a lack of legal right or specific statutory language, it is clearly the intent of that Act that this should be the case. The undermining of this court's narrow construction of that statute in the *McKay* case through the *Hardin* case and the "hospitable" view which the Court has recently taken of construction of its provisions in *Abbott Laboratories* leads us to believe that a decision for standing is both sound law and in accord with the recent trend of decisions in the Supreme Court.

Of course it is true that the grant of standing must be carefully controlled by the exercise of judicial discretion in order that completely frivolous lawsuits will be averted. There must be a practical separation of the meritorious sheep from the capricious goats—a recognition that *cucullus non facit monachum.* However, responsible federal judges will be able to discern a case in which there is injury in fact, a sufficient adversary interest to constitute a case or controversy under Article III, and an otherwise reviewable subject matter to prevent the dockets from becoming overcrowded. The court should have discretion to grant standing, provided the other criteria listed above are properly met.

The spectre of opening a Pandora's box of litigation has always seemed groundless to us, particularly in the area of standing to sue. Certainly the same hue and cry went up when the states relaxed the criteria for standing to sue; but so far the dockets in the states have not increased appreciably as a result of new cases in which standing would previously have been denied.[13] We agree with the analysis of our sister Circuit in Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 617 (2d Cir. 1965), *cert. denied, sub nom* Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966):

> We see no justification for the Commission's fear that our determination [granting standing] will encourage "literally thousands" to intervene and seek review in future proceedings. We rejected a similar contention in Associated Industries, Inc. v. Ickes * * *

13. 3 K. Davis, *supra* note 2, at 294.

noting that "no such horrendous possibilities" exist. Our experience with public actions confirms the view that the expense and vexation of legal proceedings is [sic] not lightly undertaken.

The fundamental problem is that the early cases, in rhetoric always impressive but in understandibility often determinedly so obscure as to deftly puncture the bubble of that very rhetoric, gave birth to an unruly concept. It has been pointed out that:

> The cases indicate no appreciable difference between one who has an "interest," one who is "adversely affected," and one who is "aggrieved." True, each concept becomes a receptacle for ideas about standing, but what is read into any one concept could just as readily be read into either of the others.[14]

This leads to the unfortunate and intolerable result that:

> One who is seriously harmed by reviewable administrative action which is illegal or even unconstitutional is often denied judicial review on account of lack of standing. The law of standing is fundamentally artificial to the extent that one who is in fact harmed by administrative action is held to lack standing to challenge the legality of the action. The artificiality—frequently running counter to natural instincts of judges—results in a complexity that is so great that the Supreme Court often violates the principles that the Court has laid down for its own guidance.[15]

Of course we make no decision regarding the merits of the appellant's case; the language of this opinion should not be construed in any way to make any judgment as to the correctness of appellant's allegations. The complaint herein was dismissed as a matter of law

for insufficiency under Rule 12 of the Federal Rules of Civil Procedure; we must therefore treat the allegations thereof as being true in the light most favorable to appellant. It may well be that the district court, after a full hearing on the merits, will conclude that appellee Shaffer, through his agent, properly exercised discretion in awarding the contract in question, if indeed there was discretionary action to be taken. That court may find, on the other hand, that the contract was illegally awarded because there is no discretion to ignore the regulations regarding responsiveness of bids. In reaching the correct analysis of the threshold question of standing the court must look not to the merits of the petitioner's case but rather to his status. See Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

## II. SOVEREIGN IMMUNITY

The argument that this suit is barred by the doctrine of sovereign immunity, a proposition urged below in the motion to dismiss, is erroneous.

■ Having found the provisions of section 10 of the Administrative Procedure Act applicable, the court is persuaded that the ancient doctrine of sovereign immunity has no application. The Fifth Circuit has held that the Administrative Procedure Act, where applicable, serves as a waiver of sovereign immunity. In Estrada v. Ahrens, 296 F.2d 690, 698 (1961), that court said:

> By providing judicial review in an action brought by "any person adversely affected or aggrieved by any agency action" Congress permitted suits which under established tests would certainly be barred as suits against the government. * * * *The Act thereby makes a clear waiver of sovereign immunity in actions to which it applies.* (Emphasis added.)[16]

Home Owners Ass'n v. Dep't of Housing & Urban Dev., 284 F.Supp. 809, 834 (E.D. Pa.1968); see also 3 K. Davis,

14. 3 K. Davis, *supra* note 2, at 216.

15. *Id.* at 210.

16. *See* Adams v. Witmer, 271 F.2d 29, 34–35 (9th Cir. 1958); Powelton Civic

It seems axiomatic to us that one must imply, from a statement by the Congress that judicial review of agency action will be granted, an intention on the part of Congress to waive the right of sovereign immunity; any other construction would make the review provisions illusory.

## III. ADMINISTRATIVE DISCRETION

In denying the appellant's motion for summary reversal this court requested that the parties brief the standing issue and the question of whether, assuming the appellant was found to have standing, the Administrator's decision was nevertheless "committeed to agency discretion" as provided in 5 U.S.C. § 701(a) (2) (Supp. IV 1965–68).

■ The problem illustrated by appellee's apparent misconception of the nature of issues reserved to agency discretion is resolved by a careful reading of the various parts of section 10 of the Administrative Procedure Act; while review is not granted for action "by law committed to agency discretion," as noted in section 701(a) (2), review is expressly provided for when there is an abuse of that discretion:

> *Scope of review.* \* \* \* [The reviewing court] shall \* \* \* (2) hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; \* \* \*.

5 U.S.C. § 706(2) (A) (Supp. IV 1965–68). As this court recently observed in Curran v. Laird, 136 U.S.App.D.C. 280, 420 F.2d 122 (1969) (*en banc*), in discussing section 701(a) (2), there is a "general rule that official administrative action is reviewable in courts when a person claims injury from an act taken by a government official in excess of his powers." (136 U.S.App.D.C. at 286, 420 F.2d at 128.)

As we have noted above, it is incontestable that many areas of government contracting are properly left to administrative discretion; the courts will not invade the domain of this discretion, but neither can the agency or official be allowed to exceed the legal perimeters thereof. Contracting officials can exercise discretion upon a broad range of issues confronting them; they may not, however, opt to act illegally. When the bounds of discretion give way to the stricter boundaries of law, administrative discretion gives way to judicial review.[17]

The regulations of the Federal Aviation Administration have the force of law. Stork v. United States, 278 F.Supp. 869, 875–876 (S.D. Calif.1967). The procurement regulations also have the force of law. Paul v. United States, 371 U.S. 245, 255, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). When a prima facie showing of the violation of those regulations has been made the agency may not be heard to say that the matter in question has been left to its discretion.

Appellee Cutler-Hammer argues that the discretion of the Administrator to reject all bids is controlling. Robert F. Simmons & Assoc. v. United States, 175 Ct.Cl. 510, 360 F.2d 962 (1966). This case is inapposite. While he may very well have the power to reject all bids if he deems such action to be in the public interest, he may not award a contract illegally under the guise of discretionary action.

For the same reason appellee Shaffer is incorrect in his reliance on the argument that the nature of the decisions to be made in the federal procurement

*supra* note 2, at 434–47; H. Hart & H. Wechsler, The Federal Courts and the Federal System, 1161–63 (1953); Cahn & Cahn, The New Sovereign Immunity, 81 Harv.L.Rev. 929 (1968); Note, Administration of Claims Against the Sovereign—A Survey of State Techniques, 68 Harv.L.Rev. 506 (1955).

17. For a general analysis of this entire problem *see* Berger, Administrative Arbitrariness: A Synthesis, 78 Yale L.J. 965 (1969); *compare* Saferstein, Nonreviewability: A Functional Anaylsis of "Committed to Agency Discretion," 82 Harv. L.Rev. 367 (1968).

process places determinations made therein beyond the scope of judicial review. The argument is made that these

> determinations necessarily involve "questions of judgment requiring close analysis and nice choices," Panama Canal Co. v. Grace Line, 356 U.S. 309, 318, 78 S.Ct. 752, 758, 2 L.Ed.2d 788 [1958], which cannot be judicially reviewed. * * *

(Brief for Appellee Shaffer at 20). The brief goes on to cite in the margin the words of Mr. Justice Frankfurter, concurring in Driscoll v. Edison Light & Power Co., 307 U.S. 104, 122, 59 S.Ct. 715, 724, 83 L.Ed. 1134 (1939), to the effect that disputes involved in such cases do "not present questions of an essentially legal nature in the sense that legal education and lawyers' learning afford peculiar competence for their adjustment." In the current case the questions presented go precisely to the legality of the administrative action; the courts are more "peculiarly competent" to decide such questions than anyone else.

We therefore hold that where, as here, a prima facie showing of illegality is made, the question is uniquely appropriate for judicial determination; a plea that such actions are reserved to agency discretion will not be allowed to deny review.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

At oral argument the question of exhaustion of administrative remedies was raised from the bench and the parties were asked to file supplemental memoranda on this point. On the basis of those memoranda and after much independent research, the court is of the opinion that complaints such as that involved in the case at bar are properly raised in the district court.

The agency action of which the appellant seeks review is final—appellant Scanwell's bid has been rejected and the contract awarded to Cutler-Hammer. While it is true that appellant could have petitioned the Comptroller General for review of the award under the provisions of 31 U.S.C. § 71 (1964),[18] there is no requirement that this action be taken prior to seeking review of the agency's final order in the district court. This provision and the regulations promulgated thereunder, 4 C.F.R. §§ 31.1–31.8 (1969), are designed to provide procedures through which claims on behalf of or against the government are to be settled. While claims arising out of contracts with the government are clearly covered, it would require distorted statutory interpretation for us to hold that a bidder who challenges the legality of agency action in awarding a contract is *required* to file a claim with the General Accounting Office before proceeding with action to secure judicial review of the transaction.[19]

One of the basic purposes of the exhaustion doctrine is to provide a full and complete record upon which the court can base its review of the administrative action. The regulations governing the set-

18. This section provides that "[a]ll claims and demands whatever by the Government of the United States or against it, and all accounts whatever in which the Government of the United States is concerned, either as debtor or creditor, shall be settled and adjusted in the General Accounting Office."

19. The regulations relating specifically to bid protests are also permissive rather than mandatory in nature:

> An interested party wishing to protest the proposed award of a contract, or the award of a contract, * * * *may* do so by addressing a telegram or letter to the Comptroller General of the United States * * * *identifying the procurement* * * * concerned and stating the specific grounds upon which the protest is based.

4 C.F.R. § 20.1 (1969). The reasonable interpretation of this regulation is that this is one means by which a protest may be made; the nature of the procedure which such a protest starts is indicative of the fact that this is not the sole avenue of protest available.

tlement of claims under the Comptroller General's authority specifically state that:

> Claims are settled on the basis of the facts as established by the Government agency concerned and by evidence submitted by the claimant. Settlements are founded on a determination of the legal liability of the United States under the factual situation involved as established by the written record. The burden is on the claimants. * * * The settlement of claims is based upon the written record only.[20]

With this framework for review of agency action we fail to understand appellee's argument that one is required to seek review in the General Accounting Office in order to meet the requirements of the exhaustion doctrine. While this may serve as a useful alternative procedure under certain circumstances, it is not a prerequisite to court review. The district court will have the benefit of the record upon which the Comptroller General would rely. No additional findings of fact would be made and no hearings would be held; there would therefore be no additional groundwork laid for the court to review. Under the circumstances, and given the fact that the questions under review are legal questions, we think that the appellant may properly bring the action in the district court.

## V. CONCLUSION

For the foregoing reasons we hold that appellant has standing to bring suit in the district court, that its suit is not barred by considerations of sovereign immunity, administrative discretion, or failure to exhaust administrative remedies, and that the case will be remanded to the district court for a hearing on the merits of appellant's claim.

Reversed and remanded.