**STEUART PETROLEUM COMPANY et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 77–1398.

United States District Court, District of Columbia.

Oct. 12, 1977.

528

Robert V. Smith, Smith, Herndon, Kiernan & Tausig, Richard E. Schattman, Midlen & Reddy, Walter H. Fleischer, Raymond D. Battocchi, and Alfred F. Belcuore, Cole & Groner, Washington, D.C., Timothy C. Russell, Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiffs.

Michael I. Gewirtz, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

### I. *Background Facts*

SIRICA, District Judge.

This case involves a protest by unsuccessful bidders for a series of government contracts. Suit was brought by plaintiffs Steuart Petroleum Company (Steuart) and L. A. Swann Oil Company (Swann) to set aside as unlawful the award of certain supply contracts, to prevent the contracting authority from making purchases under the contracts and to compel the government to award the contracts to plaintiffs. Steuart and Swann base their claim on the assertion that the contracting agency breached applicable procurement regulations in awarding the contracts at issue.

The dispute arises out of a procurement process initiated by the Department of Defense (DOD) for the acquisition of petroleum supplies needed to meet fuel requirements for military and related civilian installations in the mid-Atlantic region. The procurement involved an ordering period beginning August 1, 1977 and ending a year later. On March 7, 1977, the Defense Fuel Supply Center (DFSC), a procurement unit in the DOD hierarchy, issued an advertisement inviting interested dealers to submit bids for the supply contracts. The invitation permitted the competing bidders to submit offers for the supply of any number of the numerous supply items detailed in the solicitation. Steuart entered a bid to supply no fewer than 16 items and, as required by the advertisement, represented itself to be qualified to receive the contracts. Swann made a comparable representation with regard to at least two items for which it sought awards. Roarda, Inc. (Roarda) did the same with regard to approximately 150 supply items in a bid that put it in direct competition with Steuart and Swann.

The solicitation contemplated the award of contracts on a fixed price basis. But the advertisement let bidders specify a price figure accompanied by an escalator provision to take account of the volatile nature of petroleum prices. Beyond this, bidders were allowed to select their own escalator reference from among a number of market indicators so long as the selection complied with limitations imposed by the contracting authority. Steuart and Swann chose to use an escalator provision keyed to a market indicator known as the New York Harbor contract price. Roarda, on the other hand, employed an escalator based on New York Harbor Spot Cargo prices.

The bids were opened on April 12, 1977. After a preliminary evaluation of all bids, the DFCS determined that Roarda had submitted the most favorable bid for the supply of a large number of installations, including the installations in the Washington, D. C. and coastal Virginia regions for whose supply Steuart and Swann had put in bids. On these Steuart and Swann were apparent second low bidders.

Approximately a week later, Steuart advised the DFSC that the company intended to lodge a protest against the award of any supply contract to Roarda. Swann similarly informed the agency a short time thereafter. Plaintiffs then proceeded to level formal protests based principally on the claims (A) that Roarda did not qualify as a "regular dealer" in petroleum as required by the Walsh-Healey Public Contracts Act, 41 U.S.C. §§ 35–45 (1970), and applicable regulations, 41 C.F.R. § 50–201.101 and (B) that Roarda was not the lowest "responsible bidder" within the meaning of 10 U.S.C. § 2305(c) and relevant Armed Service Procurement Regulations because the price quotation submitted by Roarda incorporated an upwardly volatile price escalator that would mean sharply higher costs to the government than if Steuart and Swann were awarded the contracts.

The agency then initiated an investigation of the grounds behind the protests. This entailed collecting and assembling large amounts of documentary information relevant to determining the kind of business carried on by Roarda, with special attention being given to its facilities, equipment, management and work force, customers, suppliers and record of past performance. Also involved was an economic eval-

uation of the price escalator provisions used by the competing bidders.

On July 26, 1977, the contracting authority preliminarily found on the basis of the background investigation it made that Roarda qualified as a "regular dealer" in petroleum. Two days later, the administrative file was forwarded to the Secretary of Labor pursuant to 32 C.F.R. § 12–604 for a final determination of the "regular dealer" issue. This decision, yet to be handed down by the Department of Labor, will bind the agency with regard to the Walsh-Healey protest. The head of the procurement agency also concluded based on an examination of the pricing methods used by the competing bidders that the evidence did not warrant disturbing the preliminary determination that Roarda was a "responsible bidder" for the contracts in dispute. This decision, like the Walsh-Healey determination, is also administratively pending.

The pendency of these administrative appeals did not, however, prevent the procurement agency from proceeding to make a final award of the disputed contracts. Based on a finding that petroleum products were urgently needed, the contracting agency acted under 32 C.F.R. §§ 12–407.-8(b)(3)(i–iii) and 12–604(a)(5)(i–iii) to go forward and award the supply contracts to Roarda notwithstanding the pending appeals. This decision, however, remains subject to reversal depending on the outcome of the administrative appeals. If the Department of Labor determines that the DFSC erred in finding Roarda qualified as a "regular dealer" in petroleum, the agency is bound to terminate the award and take necessary measures to obtain an alternate supply of fuel. The agency must also take cognizance of a decision by the Government Accounting Office on the question of whether Roarda qualified as a "responsible bidder."

The decision to award the contracts to Roarda was announced on August 10, 1977. This lawsuit followed immediately. The case is presently before the Court on plaintiffs' application for a preliminary injunction. For the reasons that follow, the Court is of the opinion that the application should be granted, but with conditions designed to make sure that alternate procurements can be arranged.

## II. *The Standard for Review*

 Settled precedent affords disappointed bidders access to the courts to redress unlawful decisions made by procurement officers. *Scanwell Laboratories v. Shaffer,* 173 U.S.App.D.C. 371, 424 F.2d 859 (1970) provides explicit authority for the view that the doctrines of standing, sovereign immunity and exhaustion of administrative remedies pose no barriers to judicial intervention in the contracting process. *Id.* at 384–88, 424 F.2d at 872–76. *Scanwell Laboratories* also establishes that the broad discretion exercised by contracting officials in fulfilling their procurement responsibilities does not prevent judicial review in instances where suit is brought to correct a clear violation of law. *Id.* at 386–87, 424 F.2d at 874–75. By the same token *Scanwell Laboratories* does not furnish litigants with a license to challenge any adverse procurement decision. Where the challenge is leveled against administrative action peculiarly within the competence of procurement authorities, judicial review is unavailable. *Id.* The same is true where a particular decision is committed to agency discretion. *Id.*

 Judicial relief is equally unavailable where suit is brought merely to fault the contracting agency for pursuing one course of action when reasonable minds might have chosen another. This is made plain in the leading case of *M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 455 F.2d 1289 (1971). *Steinthal* places strict limitations on the kind of review to be given cases where a "losing bidder has rushed into court seeking to halt [a] particular procurement and to obtain an immediate judicial reconsideration of the agency's determination." *Id.* at 233, 455 F.2d at 1301. *Steinthal* restricts the inquiry to a determination of "whether the procurement

agency's decision had a reasonable basis." *Id.*

■ Furthermore, great deference is owed to the administrative judgment "even though [the court] might, as an original proposition, have reached a different conclusion." *Id.* This deference is born of the fact that procurement decisions frequently involve the application of "technical, and often esoteric, regulations to the complicated circumstances of individual procurements." *Id.* This cautious approach is also required by the imperative of not "render[ing] uncertain for a prolonged period of time government contracts which are vital to the functions performed by the sovereign." *Id.* at 235, 455 F.2d at 1303, *quoting Blackhawk Heating and Plumbing Co. v. Driver,* 140 U.S.App.D.C. 31, 35, 433 F.2d 1137, 1141 (1970). A final factor is the emergency character of litigation aimed at overturning procurement decisions. The typical case does not reach the courts until after performance on the disputed contracts has begun and by then the only effective remedy is "immediate, injunctive relief" rendered on an "expedited" basis. *Id.,* 147 U.S.App.D.C. at 235, 455 F.2d at 1303. Thus the courts are "thrust into the vortex of emergency litigation" without having the "time available to become steeped in the pertinent learning." *Id.*

■ Out of these practical considerations emerges the applicable standard for reviewing procurement challenges. The rule is simply that judicial intervention in the contracting process is warranted only to correct clear breaches of duty and gross administrative misjudgments. Short of that judicial relief is unavailable.

### III. *Application*

#### A. *The "regular dealer" requirement*

■ In order to receive a government contract in excess of $10,000 in value, bidders must meet the requirements of the Walsh-Healey Public Contracts Act, 41 U.S.C. §§ 35–45 (1970). Section 2 of the Act requires government contractors to qualify as "regular dealers" in the materials "to be manufactured or used in the performance of the contract." 41 U.S.C. § 35(a)(1970). The requirement is intended to restrict the bounty of government contracts to established dealers because they are most likely to effect the Walsh-Healey goals of maintaining high labor standards in connection with wages and conditions. But the Act does not offer a definition of the term "regular dealer." Instead the matter of setting eligibility criteria is left to the Secretary of Labor, who, by statute, is charged with implementing the aims of the Walsh-Healey Act. *See* 41 U.S.C. § 38 (1970).

The definition for "regular dealer" in petroleum appears at 41 C.F.R. § 50–201.-101(b)6.[1] It reads:

A regular dealer in petroleum may be a person who owns, operates, or maintains petroleum distribution equipment and a store, warehouse, or other place of business in which petroleum products of the general character described by the specifications and required under the contract are bought for the account of such person and sold to the public in the usual course of business, and whose principal business is such purchase and sale of such petroleum products.

1. This definition is the more specific of two provisions setting eligibility criteria for petroleum businesses. The general definition of "regular dealer" appears at 41 C.F.R. § 50–201.-101(b), and reads:

A bidder or contractor shall be deemed to be a . . . "regular dealer" within the meaning of [the Walsh-Healey Act] if he falls within one of the following categories:

. . . . .

(b) A regular dealer is a person who owns, operates, or maintains a store, warehouse or other establishment in which the materials,

supplies, articles, or equipment of the general character described by the specifications and required under the contract are bought, kept in stock, and sold to the public in the usual course of business.

The essential difference between these two provisions is that the more specific regulation eliminates the requirement that the business maintain a stock of the products to be supplied under the government contract. See 41 C.F.R. § 50–206.54, 42 Fed.Reg. 26027 (May 20, 1977) (proposed regulation).

The parties agree that the lawfulness of the disputed contracts is to be tested by the criteria set out in section 201.101(b)6. They disagree, however, as to precisely what these are. Chief among their differences is the meaning of the term "principal business." Steuart and Swann read the "principal business" language as referring to the volume of sales made to the general public. Hence a business does not qualify as a "regular dealer" in petroleum unless a majority of sales are made to the private sector. The government, on the other hand, interprets the same language as requiring only that the business be principally engaged in marketing petroleum as long as substantial[2] sales are made to the public.

The issue is apparently one of first impression. A studied review of relevant decisions by the courts and Department of Labor reveals that no case has turned on the proper construction to be given section 201.101(b)6. The only cases dealing with the "regular dealer" requirement involve interpretations of the standard definition of the term that appears at section 201.101(b). Similarly, no decision has addressed the meaning of comparable "principal business" language contained in parallel regulations that define "regular dealers" in products other than petroleum. See § 201.101(b)3, 4, 5 & 9.

Beyond this, the ambiguity contained in § 201.101(b)6 is not readily answered by looking to the purpose of the "regular dealer" requirement. The regulation is designed to carry out the statutory objective of maintaining fair labor standards for workers employed by government contractors by limiting government contracts to establish dealers with a business history

that indicates an ability to comply with Walsh-Healey requirements. See 41 U.S.C. § 35(b–e) (1970). In the Court's view, both of the interpretations offered here appear reasonable in light of the statutory objective. The essential difference between is merely one of numerical degree.

■ There is, however, one indication that the government's interpretation should prevail for present purposes. This involves a comparison between the standard definition for "regular dealer" and the specific regulations for "regular dealer" in particular products. A comparison shows that the specific regulations are meant to expand the standard definition by removing the requirement that dealers maintain a stock of the items called for in the government procurement. See 41 C.F.R. 50–206.54, 42 Fed.Reg. 26027 (proposed regulation). Thus insofar as Steuart and Swann's interpretation of section 201.101(b)6 restricts the definition of "regular dealer" by imposing a sales requirement not mandated by the general definition, it should not be accepted.[3] This result is particularly appropriate given the fact the Department of Labor is presently in the process of rendering a threshold interpretation of section 201.101(b)6. Should the Department adopt the interpretation urged by plaintiffs, that ends the inquiry and the contracting authority is bound to abide by it. Should the Department reach a contrary conclusion, that decision is itself reviewable on the basis of the full administrative record.

For these reasons, then, the Court is of the opinion that DFSC's determination that Roarda qualified as a "regular dealer" in

---

2. The evidence shows that Roarda's sales to the general public account for approximately 13% of its total sales. Even accounting for certain sales to affiliated businesses, this figure, in the Court's judgment, qualifies as substantial.

3. Moreover, a published DOD interpretation of the standard definition of "regular dealer" merely requires that the bidder make *some* sales to commercial customers. He need not do a majority of his dealing with the public. See 32 C.F.R. § 12–603.2(a)v:

if government agencies are the sole purchasers, the bidder will not qualify as a regular dealer; the number and amount of sales which must be made to the public will necessarily vary with the amount of total sales and the nature of the business . . . (emphasis supplied).

Plaintiffs have offered no principled reason why the specific definition of "regular dealer" in petroleum should be read more strictly in this connection than the general definition.

petroleum should not be set aside pending a final decision on the merits.[4]

### B. The "responsible bidder" requirement

10 U.S.C. § 2305(c) (1970) and implementing regulations that appear at 32 C.F.R. §§ 1–900.907, 2–407.1 and 2–407.5 impose on contracting officials a duty to evaluate competing bids with a view towards selecting the "responsible bidder" whose bid "will be most advantageous to the United States, price and other factors considered." This determination involves several separate inquiries but, all things being equal,[5] cost to the government is the paramount consideration. Steuart and Swann claim that DFSC erred in declaring Roarda the lowest "responsible bidder" by failing to evaluate the competing bids in a realistic fashion. Plaintiffs fault the agency for failing to take into account a comparative analysis of the several bids that projected higher costs to the government if Roarda received the contracts rather than Steuart and Swann. These higher costs reflect Roarda's use of upwardly volatile "spot cargo" pricing. Plaintiffs also question the contracting authority for ignoring published reports, prepared by the General Services Administration and a private marketing consultant to the DFSC, that disapproved the practice of accepting bids with "spot cargo" price escalators. These failures, plaintiffs claim, amount to a breach of duty requiring judicial intervention. This Court agrees.

The government does not seriously contest the fact that substantially higher costs will result from the selection of Roarda as the winning bidder. Nor could it given the facts as they have emerged. Instead the government maintains that the selection of Roarda should nevertheless be upheld because the excessive costs associated with "spot cargo" pricing were not apparent

when the agency preliminarily found Roarda to be in line for the contracts. This took place shortly after the bids were opened in April.

■ This point, however, is not well taken. Under 32 C.F.R. § 2–407.1, the regulation dealing with the evaluation of competing bids, the duty to select the lowest "responsible bidder" is not to be discharged on the date bids are opened. A fair reading of the provision makes clear that the procurement agency is to make the determination at the time that contracts are actually awarded. In the instant case this did not occur until August. Consequently the validity of the contract award to Roarda is to be judged by the facts and circumstances that existed at the time of the award, and not, as the government contends, at the time the competing bids were first opened.

■ By this yardstick the decision awarding Roarda the disputed contract falters. A review of the relevant facts reveals that shortly after bids were opened in April and the DFSC tentatively designated Roarda as the selectee, plaintiffs Steuart and Swann lodged protests with the agency on the grounds that sharply higher costs would result due to the "spot cargo" pricing system used by Roarda. These protests were supported by market analyses that projected costs to the government under the "spot cargo" and "contract cargo" pricing methods. The analyses persuasively indicated the upwardly volatile tendency of "spot cargo" prices in comparison with the pricing methods used by plaintiffs. The wisdom of accepting "spot cargo" bids was further undercut by two studies, one published by the General Services Administration, and the other by a consultant to the DFCS, that criticized the practice of contracting on a "spot cargo" basis.[6]

---

**4.** Compare *Curtiss-Wright Corp. v. McLucas,* 364 F.Supp. 750, 773 (D.N.J.1973).

**5.** There is no indication in this case but that the agency found Steuart, Swann and Roarda to be "responsible bidder[s]." The dispositive issue then was which of these bidders had submitted the "most advantageous" bid to the government in terms of cost.

**6.** The DFCS has apparently concurred in this criticism of "spot cargo" pricing in that, at a date prior to the award of the disputed contracts to Roarda, it acted to forbid the practice in future supply contracts.

■■ But the agency nevertheless determined that Roarda had submitted the bid "most advantageous" to the government and awarded Roarda the contested contracts. This decision is traceable to the agency's natural tendency not to want to upset its own tentative decisions at the clamoring insistence of disappointed bidders.[7] But this understandable reaction does not excuse the agency from the obligation of selecting the winning bidder on the basis of developed facts. In the case at bar, either the contracting authority altogether ignored the available cost data or it failed to use this information realistically at the time the contested contracts were awarded. Either way the procurement decision involved a clear breach of duty and, for this reason, the award should be set aside pending the final outcome of this case.

## IV. *Relief*

The question of appropriate relief is easily resolved. A fair balancing of the competing interests at stake indicates that the proper remedy is simply to set aside the disputed award as to the 18 items for which plaintiffs competed with Roarda. Any broader injunctive order would, in the Court's estimation, go beyond the scope of this lawsuit. Beyond this, the Court is of the opinion that the procurement agency should be permitted some leeway in choosing a source of supply to replace Roarda. Accordingly, the Court will stay the order setting aside the awards for a period of sixty (60) days to give the contracting authority a fair opportunity to repeat the bidding process, negotiate satisfactory supply agreements or proceed in any other manner authorized by law, at its option. Nothing contained in this order, however, will prevent the agency from proceeding more swiftly if that is practicable or should the Department of Labor in the interim issue a decision finding Roarda unqualified as a "regular dealer."

An order consistent with the foregoing will be issued of even date herewith.

## V.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

## PRELIMINARY INJUNCTION

Consistent with the Memorandum Opinion issued of even date herewith, it is this 11th day of Oct., 1977,

ORDERED that the decision of the Defense Fuel Supply Center awarding fuel supply contracts under Invitation for Bids Solicitation No. 600–77–B–0003 be, and the same hereby is, set aside *pendente lite* with respect to those eighteen (18) contract items for which plaintiffs Steuart and Swann competed with Roarda, Inc. and which formed the subject of plaintiffs' administrative protests and judicial challenge; and it is

FURTHER ORDERED that all purchasing officers of the Department of Defense be, and the same hereby are, enjoined pending final disposition of this case from placing orders under any of the eighteen (18) above-described contract items, PROVIDED, HOWEVER, that this order be stayed for a period not to exceed sixty (60) days from the date of this order; and it is

FURTHER ORDERED that plaintiffs Steuart and Swann jointly post a bond in an amount yet to be determined.

---

7. The agency was particularly unwilling to reverse its earlier decision because that would likely have required starting the bidding process over again at a time after the first set of bids had become public knowledge. But this consideration did not excuse the agency from selecting a contractor based on a realistic evaluation of the competing bids.