**ULSTEIN MARITIME, LTD. and Schottel of America, Inc.**

v.

**The UNITED STATES of America, et al.**

**Civ. A. No. 86–0318 P.**

United States District Court,
D. Rhode Island.

Sept. 17, 1986.

Fred T. Polacek, Providence, R.I., Joseph A. Artabane, Washington, D.C., Sarino R. Constazo, Miami, Fla., for plaintiffs.

John Marks, Providence, R.I., Almer W. Beale, II, Jacksonville, Fla., for Thrustmaster Marine.

Lincoln C. Almond, U.S. Atty., Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., for U.S.

Martin Conlon, Providence, R.I., Raymond J. Sherbill, Washington, D.C., David L. Moseley, Houston, Tex., for Thrustmaster of Texas.

## OPINION AND ORDER

PETTINE, Senior District Judge.

Plaintiffs Ulstein Maritime, Ltd. and Schottel of America, Inc., commenced this action on May 27, 1986, for declaratory judgment and injunctive relief against defendants, the United States Navy ("Navy"), the United States Small Business Administration ("SBA") and the officials in charge of those agencies. Plaintiffs were the third and fourth low bidders on an Invitation for Bids for procurement of six marine thruster units by the Navy. They allege that defendants unlawfully awarded the contract to the first low bidder, Thrustmaster Marine, Inc. ("TMI"), and that the second low bidder, Thrustmaster of Texas ("Texas") is also ineligible for an award under this procurement. They claim that the two low bids are "nonresponsive" because of TMI's and Texas' failure to reveal their status as "affiliated bidders" and their failure to conform to the "Standard Commercial Product" clause in the bid; that the SBA unlawfully disregarded controlling Department of Labor Walsh-Healey regulations in issuing a "certificate of competency" ("COC") to TMI; and that the attempt of Texas to change its bid after bid opening precludes the Navy from further consideration of that bid.

The plaintiffs seek review and reversal of the agencies' actions pursuant to the Armed Services Procurement Act of 1947, 10 U.S.C. § 2301 *et seq.*, regulations codified thereunder at Title 48 of the Code of Federal Regulations (the Federal Acquisition Regulations or "FAR"), the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the Small Business Act, 15 U.S.C. § 631 *et seq.*, and the Walsh-Healey Public Contracts Act, 41 U.S.C. § 35 *et seq.*

On June 3, 1986, this Court issued a temporary restraining order barring the Navy from expending funds and further proceeding on the contract. Shortly before trial, TMI and Texas were each allowed to intervene in this action. Trial proceedings on the merits of plaintiffs' complaint and on Texas' crossclaim were held from June 30, 1986, through July 2, 1986. I now make the following factual and legal findings.

*Factual Findings*

The plaintiffs, Ulstein and Schottel, both produce marine thruster units. Ulstein is a Canadian corporation with its principal place of business in Burnaby, British Columbia, Canada. Reginald Allen is its president. Schottel is a Florida corporation with its principal place of business in Miami, Florida. Peter Jacobs is executive vice-president.

Defendant United States of America procures goods and services from private sector businesses through its agents and departments, including the Department of the Navy, subject to the laws of the United States. Defendant John F. Lehman, Jr., is Secretary of the Navy and is responsible in his official capacity for the acts complained of by plaintiffs and intervenor Texas. Defendant SBA is authorized under 15 U.S.C. § 637(b)(7) to make determinations binding upon the Navy "with respect to all elements of responsibility" of prospective small business government contractors and to issue a "Certificate of Competency" ("COC") where such determinations are favorable to the prospective contractor. Defendant Charles Heatherly is SBA Acting Administrator and is responsible in his official capacity for the acts complained of in this suit.

Intervenor TMI is a Florida corporation with its principal place of business in Jacksonville, Florida. Bert de Wys is president of the company. Intervenor Texas is a Texas corporation with its principal place of business in Houston, Texas. Both of these companies are also purportedly in the business of manufacturing marine thruster units.

On December 5, 1985, Naval Engineering Facilities Command ("NAVFAC") Contracting Officer Raymond Farrow, through James Morrin, the contract specialist, issued Invitation for Bids No. N62578–86–B–6002 (the "IFB") seeking bids for six 7500 pound marine thruster units and ancillary items. The bids contained two clauses especially relevant to this action. The first is the "Affiliated Bidders" clause, and the second is the "Standard Commercial Product" ("SCP") clause.

Five companies submitted bids to the Navy in response to the IFB as follows:

| | |
|---|---|
| Thrustmaster Marine, Inc. | $480,900.00 |
| Thrustmaster of Texas, Inc. | $499,590.00 |
| Schottel of America, Inc. | $666,300.00 |
| Ulstein Maritime, Ltd. | $667,400.00 |
| Harbormaster Division of Mathewson Corp. | $795,300.00 |

NAVFAC's cost estimate for the IFB was $749,400.00.

Senior personnel at NAVFAC then reviewed the bids. Since the two low bids were in excess of 30 percent below the government's estimate, on January 13, 1986, NAVFAC requested that TMI and Texas confirm their bids given the possibility a mistake had occurred. TMI confirmed its bid, but Texas requested the opportunity to modify its bid by $60,000 because of clerical error. The request for modification was considered "not technically supportable" by NAVFAC engineering personnel, Exhibit 9, however, and therefore was rejected.

The Navy determined that the bid of TMI, the putative low bidder, as a matter of written form alone, conformed with the requirements of the IFB, i.e., all the information, including signatures and certifications, required by the IFB was supplied, and no exceptions to any of the terms and conditions appeared on the bid. Therefore, the Navy considered TMI's bid to be "responsive" within the meaning of FAR 14.-301.[1]

The Navy is also required by federal regulation to determine whether or not a prospective contractor is "responsible" before awarding a contract. FAR § 9.104–1. As the Navy had done no previous business with TMI when its bid was submitted, the Navy referred TMI's bid to the Defense Contract Administration Services ("DCAS") for performance of a pre-award survey so as to determine the "responsibility" of TMI to fulfill its bid if accepted by the Navy. This referral was made in accord with es-

---

1. This regulation and its interpretation will be discussed *infra* with respect to the SCP-clause.

tablished practice and the applicable regulations.[2]

Meanwhile, on January 20, 1986, Ulstein filed a bid protest with the Navy pursuant to FAR § 33.103(a). Schottel filed a similar protest on January 27, 1986. Both protests alleged that the bids of TMI and Texas were nonresponsive and must be rejected because the companies had failed to disclose their relationship as affiliated bidders as required by the IFB "Affiliated Bidders" clause and had in fact collusively bid on the contract. This claim of affiliation and collusion rested on the deposition of Bert de Wys, taken during the bankruptcy proceedings of his former company, Thrustmaster, Inc. of Mississippi. Based on that deposition, Ulstein and Schottel alleged that: de Wys, the president of TMI, did consulting work for a firm by the name of International IMS, Inc., located in Houston, Texas; Texas was a wholly owned subsidiary of IMS; de Wys was involved in the formation of Texas; thrusters provided by Texas are virtually identical to those of TMI; and Texas and de Wys' bankrupt company had shared the same chief engineer, Frank Van Bentem.

Both Ulstein and Schottel further claimed that TMI lacked the manufacturing and design capacity to complete the contract. Schottel also alleged that Texas was physically and financially incapable of concluding the contract, in particular, that its production costs were not covered by its bid package, and that it lacked the experience necessary for building 7500 pound Thruster units. Schottel urged NAVFAC to disqualify both TMI and Texas, and Ulstein requested that award of the contract not be made pending investigation of its protest.

On March 5, 1986, DCAS advised the Navy's Contract Specialist, James Morrin, that it had completed the preaward survey and that it recommended *no award* should be made to TMI because TMI was not a responsible bidder. Specifically, DCAS found that although TMI had satisfactory technical, quality assurance, and financial capabilities, it had unsatisfactory production capability and failed to meet the requirements of the Walsh-Healey Public Contracts Act, 41 U.S.C. §§ 35–45. The preaward survey report indicated that TMI lacked adequate facilities and personnel and that it did not qualify as a "manufacturer" in accordance with Walsh-Healey.

TMI had certified in its bid that it was a "small business" within the meaning of the Small Business Act. Therefore, after the DCAS determination of nonresponsibility and recommendation of no award, the Navy referred its file on TMI to the SBA as required by 15 U.S.C. § 637(b) and FAR §§ 9.104–3(e), 19.601. TMI then petitioned the SBA for a Certificate of Competency ("COC") that TMI was indeed a responsible bidder and thus eligible for the contract award. Billie L. Seacrest, an Industrial Specialist in Atlanta, Georgia, was assigned the matter and instructed to investigate TMI's qualifications.

In investigating TMI's competency, Seacrest proceeded by requesting necessary information by letter and making a site visit in March. TMI's technical background, resumes, quality assurance arrangements, material quotes, and production plans, including leased facilities, were reviewed, as were its engineering capabilities for preparing manuals, drawings, and design of the unit. Based upon his investigation, Seacrest recommended that, from a capacity standpoint, a COC be issued to TMI. He concluded that TMI met the manufacturer/assembler eligibility requirements of Walsh-Healey because it would be performing more than "minimal tasks (i.e. design, engineering, purchasing, contract administration, testing, packaging, some fabrication and subassembly assembly [sic], final assembly)." Ex. 60, p. 3. He also noted with respect to Walsh-Healey qualifications

---

**2.** FAR § 9.106–1(a) provides in relevant part: "A preaward survey is normally required when the information on hand or readily available to the contracting officer is not sufficient to make a determination regarding responsibility." DCAS routinely determines the "responsibility" of bidders to perform contracts.

that TMI had executed a two-year lease with North Florida Shipyards, Inc., for exclusive space for manufacture of propelling units, that employment agreements had been consummated so that production personnel were available, and that the various production plans were not made solely for performance of this particular contract. Seacrest additionally found that the firm's principals had the necessary qualifications and experience in design and production of propelling units and that the firm had adequate facilities and equipment, a time-phased production plan adequate to meet the required delivery schedule, available parts, materials, and subassemblies, and open capacity when needed.

Based upon this recommendation and the receipt of an unqualified letter of credit,[3] the SBA issued a COC respecting TMI to the Navy on or about April 30, 1986. When the Navy was advised that the COC had been issued, it determined that it was required by law (15 U.S.C. § 637(b)(7)) to accept the bid of, and award the contract to, TMI. On this basis, the Navy awarded the contract to TMI on May 7, 1986. At the same time, Schottel and Ulstein were notified that their protests had been denied. They received this notice on May 20, 1986, and then instituted this action.

I further find that Ulstein and Schottel will suffer irreparable and monetarily unquantifiable harm if they are denied the relief they request. Ulstein will suffer layoff of at least four highly skilled and valuable machinists, fabricators, and assemblers, loss of 6000 hours of labor whose services may never be again retained, loss of market share, increased overhead burden on other work, substantial risk of losing its project management team, diminished ability to compete for other work, lost profits and loss of business reputation. Schottel will suffer similar irreparable injury. NAVFAC admits there is no urgent need for these marine thrusters, and TMI

has not yet expended substantial funds in executing the contract.

Further factual findings will be made as relevant to the legal discussion below.

### Jurisdictional and Procedural Issues

Before addressing the merits of the plaintiffs' lawsuit, I must first decide a number of preliminary issues. First, the defendants claim that this court lacks jurisdiction over this action because the injunction sought against the Navy prohibiting it from awarding the contract to TMI is tantamount to an injunction issued against the SBA and is therefore precluded by 15 U.S.C. §§ 637(b)(7) and 634(b)(1). Second, they claim that the plaintiffs lack standing. Finally, defendants and intervenor Texas question whether the plaintiffs adequately raised the same issues before the agency and in their complaint so as to be able to seek review from this court.

### Jurisdiction and Scope of Review

 The district courts have power to review and overturn federal administrative actions that are arbitrary and capricious, an abuse of discretion, or reflect a failure to comply with applicable laws or regulations. APA, 5 U.S.C. § 706(2)(A) and (D); *In re Smith & Wesson,* 757 F.2d 431, 433 (1st Cir.1985); *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 874 (D.C.Cir.1970). As recently stated by the First Circuit with respect to review of government procurement contracts, "[a] disappointed bidder on a government contract must show that the decision by the government agency either had no rational basis or involved a clear and prejudicial violation of applicable statutes or regulations." *Smith v. Wesson v. United States,* 782 F.2d 1074, 1078 (1st Cir.1986).

 Although a court's *scope* of review of agency action is somewhat circumscribed by this standard, it is clear that a district court does indeed have the *power*

---

**3.** Apparently, there was some initial concern on the part of the individual at the SBA who reviewed TMI's financial capacity about its adequacy in that area. It was deemed that TMI was financially incapable of performing the contract. The Certificate of Competency Review Committee at the SBA felt, however, that those concerns were adequately addressed by TMI's obtaining of an unqualified bank letter of credit.

to make such a review, and therefore that this court can review the actions of the Navy and the SBA in this instance. The defendants contend, however, that this court cannot issue the requested injunctive and declaratory relief as against both the Navy and SBA, because of 15 U.S.C. §§ 634(b)(1) and 637(b)(7).

Under 15 U.S.C. § 637(b)(7), the Navy is required to accept a COC issued by the SBA as conclusive on the issue of "responsibility" and to let the government contract to the bidder, here TMI, without requiring it to meet any other requirement of responsibility of eligibility.[4] Under a facial reading of 15 U.S.C. § 634(b)(1), the courts are foreclosed from issuing injunctions against the SBA administrator.[5] The defendants' argument is that because the Navy was required to accept the SBA's certification of responsibility under 15 U.S.C. § 637(b)(7) and award the contract to TMI, any injunction which would issue against the Navy is in actuality against the SBA and prohibited by 15 U.S.C. § 634(b)(1).

I am not persuaded by the defendants' reasoning. First, some of the issues raised by the plaintiffs arguably go to the issue of "responsiveness" rather than "responsibility". On responsiveness issues, the Navy has no obligation under 15 U.S.C. § 637(b)(7) to consult the SBA, and, therefore, its discretion is in no way circumscribed. Any injunction issuing on the responsiveness issue has nothing at all to do with the SBA. Second, any injunction which would issue here would not restrain the SBA, but would only restrain the Navy. The SBA has already issued its COC and thus cannot now be enjoined from doing so.

---

4. 15 U.S.C. § 637(b)(7) provides that:
 It shall also be the duty of the Administration and it is empowered, whenever it determines such action is necessary—
 (7)(A) To certify to Government procurement officers, and officers engaged in the sale and disposal of Federal property, with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract. A Government procurement officer or an officer engaged in the sale and disposal of Federal property may not, for any reason specified in the preceding sentence, preclude any small business concern or group of such concerns from being awarded such contract without referring the matter for a final disposition to the Administration.
 (B) If a Government procurement officer finds that an otherwise qualified small business concern may be ineligible due to the provisions of section 35(a) of Title 41, [Walsh-Healey] he shall notify the Administration in writing of such finding. The Administration shall review such finding and shall either dismiss it and certify the small business concern to be an eligible Government contractor for a specific Government contract or if it concurs in the finding, forward the matter to the Secretary of Labor for final disposition, in which case the Administration may certify the small business concern only if the Secretary of Labor finds the small business concern not to be in violation.
 (C) In any case in which a small business concern or group of such concerns has been certified by the Administration pursuant to

(A) or (B) to be a responsible or eligible Government contractor as to a specific Government contract, the officers of the Government having procurement or property disposal powers are directed to accept such certification as conclusive, and shall let such Government contract to such concern or group of concerns without requiring it to meet any other requirement of responsibility or eligibility.
 Notwithstanding the first sentence of this subparagraph, the Administration may not establish an exemption from referral or notification or refuse to accept a referral or notification from a Government procurement officer made pursuant to subparagraph (A) or (B) of this paragraph, but nothing in this paragraph shall require the processing of an application for certification if the small business concern to which the referral pertains declines to have the application processed.

5. 15 U.S.C. § 634(b)(1) provides that:
 In the performance of, and with respect to the functions, powers, and duties vested in him by this chapter the [SBA] Administrator may—
 (1) sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; *but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property.* (emphasis added).

At most this court could only set aside the binding effect of the COC by way of declaratory judgment.

The defendants argue, however, that an injunction against the Navy is merely accomplishing by indirection what cannot be done directly against the SBA. They further claim that not only an injunction, but also a declaratory judgment, if issued against the SBA, is prohibited by the statutory provision.[6] I reject these arguments as too restrictive in their interpretation of section 634(b)(1).

Declaratory relief is considered the traditional remedy for the type of transactional dispute at issue in this case and is *not* considered synonymous with injunctive relief even by those courts that have endorsed defendants' indirection argument as to injunctive relief. *See Valley Construction Co. v. Marsh*, 714 F.2d 26, 29 (5th Cir.1983); *Mar v. Kleppe*, 520 F.2d 867 (10th Cir.1975); *Lloyd Wood Construction Co. v. Sandoval*, 318 F.Supp. 1167 (N.D. Ala.1970), *rev'd on other grounds sub nom., Campbell Co. v. Lloyd Wood Construction Co.*, 446 F.2d 261 (5th Cir.1971); *see also Oklahoma Aerotronics v. United States*, 661 F.2d 976, 977 (D.C.Cir.1981) ("Appellees' arguments about sovereign immunity and injunctive relief are irrelevant. This court may hold unlawful and set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' Id. § 706(2)(A). That is what we do here.") Courts have therefore permitted declaratory relief against the SBA where it affects the contracting agency's award, performance, or payment on a contract. *See, e.g., Mar v. Kleppe*, 520 F.2d at 869; *P & B Services, Inc. v. Cardenas*, 525 F.Supp. 1289, 1296–98 (D.D.C.1981); *Claxton v. SBA*, 525 F.Supp. 777, 786 (S.D.Ga.1981).

In addition, the Walsh-Healey Act, the principal provision upon which review of the SBA issuance of a COC is sought in this case, expressly provides that determinations as to whether an entity is a "manufacturer," an issue in this case, are subject to judicial review. 41 U.S.C. § 43a(c). To construe section 634(b)(1) so as to foreclose even declaratory relief would render that provision meaningless.

Finally, one court has persuasively argued that § 634(b)(1) should not even be interpreted so as to give the SBA any greater immunity from injunctive relief or other legal process than is possessed by any other federal agency. The court in *Related Industries, Inc. v. United States*, 2 Cl.Ct. 517, 522 (1983) concluded that in 1982 when Congress authorized injunctive relief against governmental agencies and departments generally on contract claims, it did not mean to exempt the SBA therefrom, despite the provisions of § 634(b)(1).[7]

---

**6.** They base this claim on the "other similar process" language in the statute. *See* footnote 5 *supra*.

**7.** The *Related Industries* argument in full is as follows:

> [N]othing in either § 634(b)(1) or its legislative history indicates that Congress intended to give the SBA any greater immunity from injunctive relief or other legal process than that possessed by any other governmental agency. Rather, it merely intended to insure that the SBA be treated the same as any other government agency in this respect. To understand the origin and purpose of § 634(b)(1) one must go back to the decision in *FHA v. Burr*, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940). There the Supreme Court ruled that when Congress establishes an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to

"sue and be sued," Congress has waived the immunity of the United States not only to suit but to all civil process incident to such proceeding, including garnishment and attachment of the agency's assets. To avoid such a result, in several instances when Congress established a new governmental agency and authorized it to engage in commercial transactions and the administrator of the agency "to sue and be sued," it added boiler plate language similar to or identical with that of § 634(b)(1), withholding consent to attachment, injunction, garnishment, and similar process.

The provisions of § 634(b)(1) may be traced back to § 205 of the Small Business Act of 1953, Ch. 282, Title II, 67 Stat. 232, 234 (1953). The legislative committees reporting on the Act apparently felt that the purpose of the section was self-evident or had been explained sufficiently in connection with prior legislation so that there was no need to comment on

See also A.C. Seeman, Inc. v. United States, 5 Cl.Ct. 386, 388 (1984); Standard Mfg. Co. v. United States, 7 Cl.Ct. 13, 14–15 (1984). For all these reasons, I find that this court is empowered to adjudicate this dispute consistently with the previously articulated standard of review appropriate in agency review cases, and also to award needed injunctive and declaratory relief.

*Standing*

I also reject defendants' claim that the plaintiffs lack standing to bring this action. This court and others have concluded that unsuccessful bidders, such as the plaintiffs, challenging procurement decisions governed by statutes and regulations satisfy the prerequisites for standing. E.g., Choctaw Manufacturing Co. v. United States, 761 F.2d 609, 615 (11th Cir.1985) and cases cited therein; International Association of Firefighters v. United States Department of the Navy, 536 F.Supp. 1254, 1266 (D.R.I. 1982) (noting that Derecktor v. Goldschmidt, 516 F.Supp. 1085 (D.R.I.1981) recognized standing of disappointed biddger).

The standing requirements are basically two-fold: that the challenged agency action has caused the plaintiffs an "injury in fact," and that such injury was to an interest "arguably within the zone of interest to be protected or regulated" by the statute or regulation claimed to be violated. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153–54, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The "injury in fact" prong of the test is satisfied here because the plaintiffs have suffered economic loss as a result of their inability to obtain the contract at issue. The "zone of interest" prong is satisfied because Congress mandates that the agencies of the United States procure goods and services through full and open competition in a manner that upholds the integrity of the competitive procurement system, Competition in Contracting Act of 1984, 31 U.S.C. §§ 3551 et seq.; 48 C.F.R. §§ 1 et seq., and because arbitrary deprivation of government contracts on irrational or non-discretionary grounds "is a serious wrong against which Congress may well have wished to protect." B.K. Instrument, Inc. v. United States, 715 F.2d 713, 719 (2d Cir.1983); cf. Choctaw Manufacturing, 761 F.2d at 616.

The government's arguments that Schottel and Ulstein as the third and fourth low bidders, rather than the second low bidder, lack a "real and palpable" injury and are too far removed from a possible award are unpersuasive. Schottel and Ulstein have the same interest as the second low bidder in having their bids considered fairly and

it in their reports. However, in explanation of a prior statute, enacted in 1948, which contained substantially identical language (the Commodity Credit Corporation Charter Act, Ch. 704, § 4, 62 Stat. 1070 (1948), currently at 15 U.S.C.A. § 714b(c) (West Supp. 1983), the Senate committee report stated (S.Rep. No. 1022, 80th Cong. 2d Sess., reprinted in 1948 U.S. Code Cong. & Ad. News 2138, 2148):

Subsection (c) provides for suability and imposes certain limitations and restrictions upon the general right to sue and be sued. It is provided that no attachment, injunction, garnishment, or similar process may be issued, either prior to or after final judgment, against the Corporation or its property. The provision is like that contained in the act creating the Federal Crop Insurance Corporation (7 U.S.C., 1940 ed., 1506). The availability of any of these judicial processes would not afford to creditors or other persons suing the Corporation any benefit which would out-

weigh the possible detriment to the Government through hindrance or obstruction of the Corporation's operations, if it were made amenable to such processes.

It is quite clear that in withholding consent to suit for injunction, garnishment and attachment against the Small Business Administrator Congress intended no special exemption for the Administrator which would be different from that accorded government agencies generally, but only that in authorizing him to sue and be sued he should have the same immunity from injunction, garnishment and attachment as government agencies generally have. Thus there is no basis for any inference that because in 1982 Congress made no specific reference to 15 U.S.C. § 634 when it authorized injunctive relief against government agencies and departments generally on contract claims before award, it meant to exempt the Small Business Administration therefrom.

2 Cl.Ct. at 522 (footnote omitted).

consistently with applicable statements and regulations. Further, Schottel and Ulstein challenge the eligibility of both the first and second low bidders so that if successful one of them at least would be directly in line for the contract. Finally, if only one of the two low bidders is found ineligible by virtue of this lawsuit, either plaintiff might still have a chance at the award as the Navy must proceed with its own determination of eligibility and might eliminate bidders who now are at the head of the line, by way of a low bid, for the contract award. The defendants' argument thus does not change my conclusion that the plaintiffs have standing to bring this action.

*Issues Adequately Raised*

Finally, before reaching the merits, I must evaluate what issues have been adequately raised by the plaintiffs in their complaint and at the administrative level so as to be decided at this time. Specifically, Texas questions the plaintiffs' claim that Texas cannot supply a standard commercial product ("SCP") in compliance with the clause at page C–3 of the IFB. Texas also questions the claim that Texas never intended its bid. The government argues that the SCP clause issue was not raised before the agency as to either Texas or TMI.

■ I begin with the SCP clause. It is indeed true that no specific reference to a violation of this clause was made in either protest letter in regards to either TMI or Texas. The protests did, however, question in more general terms the adequacy of the manufacturing and design capacity of TMI and the physical and financial capabili-

ties of Texas. I consider these statements, which are at the heart of plaintiffs' complaint here, to be sufficient so as to have raised the issue before the agency.[8] I will not view the protests so narrowly as to foreclose plaintiffs their avenue of relief.[9]

I find, however, that as to Texas, despite my construction of the protests letter, I still cannot consider the SCP clause issue. Any decision as to Texas' compliance with the SCP clause would only be made by the various agencies if TMI were eliminated from the bidding and Texas were identified as a prospective contractor. That, of course, has not as yet occurred. Consequently, the agencies empowered to make these sorts of decisions in the first instance have not yet considered the issue. I therefore have no final agency determination which is ripe for review. *See Thurman v. Tennessee Valley Authority,* 533 F.2d 180, 183 (5th Cir.1976).

■ As to the issue of whether Texas intended its bid, by no stretch of the imagination can the protests or the complaint be construed as raising that question. The facts involved in defending such a claim are totally different than those relevant to the "responsiveness" and "responsibility" issues which have been raised by plaintiffs. I can see no way to prevent prejudice to Texas, which has strenuously objected to their theory being considered, by allowing this issue to become determinative. *See* Fed.R.Civ.Pro. 15(b).[10]

Accordingly, I will further consider neither the SCP clause issue as it pertains to Texas nor the claim that Texas never intended its bid.

---

8. These arguments, as will be discussed *infra,* essentially relate to the responsibility of the two low bidders. As the defendants consider the responsibility determination to be an interrelated one, they should not here complain about the need for the individual particulars to be separately raised.

9. I note that the requirements as to exhaustion of administrative remedies are left in much measure to the discretion of the courts. See 4 K. Davis, *Administrative Law Treatise* § 26:1 (1983).

10. I also note that I have grave doubts as to whether Schottel and Ulstein could prevail on the merits of such a claim. FAR §§ 14.406 and 14.406–3 allow the procuring authority to permit correction or hold the bidder to its original bid if a mistake in the bid is claimed by the bidder. In this instance, Texas merely requested the opportunity to correct its bid; such action should not nullify its original offer.

*The Merits*

The plaintiffs' claims on the merits basically are three: both TMI and Texas should be denied the contract award because of their undisclosed affiliation; TMI should be denied the award because its bid was nonresponsive in that TMI did not and cannot offer a "standard commercial product"; the SBA unlawfully granted TMI a COC when TMI is a nonresponsible bidder. I will discuss each claim seriatim.

*Undisclosed Affiliation*

■ Clause L–11 of the IFB is entitled "Affiliated Bidders" and requires each bidder to submit an affidavit either stating that it has no affiliate or identifying the names and addresses of all affiliates of the bidder.[11] This clause was taken verbatim from FAR § 52.214–17 and inserted in compliance with FAR § 14.201–6(k) providing that:

> The contracting officer shall insert the provision at 52.214–17, Affiliated Bidders, in invitations for bids if the contracting officer determines that disclosure of affiliated bidders is necessary to

prevent practices prejudicial to full and open competition, such as improper multiple bidding.

I will assume, without deciding, that this clause, requiring disclosure of affiliated bidder status, was included so as to prevent prejudice to other bidders and to the integrity of the competitive bidding system, and therefore that failure to disclose affiliation cannot be waived as a "minor irregularity."[12] I will assume, therefore, that TMI and Texas would be required to disclose each other as affiliates, if they were indeed such, or the defendants could not legally award them the contract.[13] I find, however, that the evidence as to affiliation is insufficient to overcome the reasoned determination of the contracting officer that no affiliation or collusion in fact existed between TMI and Texas, and therefore that TMI's and Texas' bids were not defective in failing to disclose this affiliation.

FAR § 19.101 provides, in relevant part, that "business concerns are affiliates of each other if, directly or indirectly, (a) either one controls or has the power to con-

---

11. The affiliated bidders clause provides that:

(a) Business concerns are affiliates of each other when, either directly or indirectly, (1) one concern controls or has the power to control the other, or (2) a third party controls or has the power to control both.

(b) Each bidder shall submit with its bid an affidavit stating that it has no affiliates, or containing the following information:

(1) The names and addresses of all affiliates of the bidder.

(2) The names and addresses of all persons and concerns exercising control or ownership of the bidder and any or all of its affiliates, and whether they exercise such control or ownership as common officers, directors, stockholders holding controlling interest, or otherwise.

12. Earlier in this action, there was debate about whether failure to disclose affiliation status might fall within FAR § 14.405, entitled minor informalities or irregularities. Specifically, § 14.405(e) provides that:

A minor informality or irregularity is one that is merely a matter of form and not of substance. It also pertains to some immaterial defect in a bid or variation of a bid from the exact requirements of the invitation that can be corrected or waived without being prejudicial to other bidders. The defect or

variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired. The contracting officer either shall give the bidder an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid or waive the deficiency, whichever is to the advantage of the Government. Examples of minor informalities or irregularities include failure of a bidder to—

. . . .

(e) Furnish affidavits concerning parent company and affiliates, if required pursuant to the clause of 52.214–8, Parent Company and Identifying Data, and 52.214–17, Affiliated Bidders;

Thus, under this provision a contracting officer might be able to waive the failure of a bidder to disclose its affiliation status.

13. I also need not decide for purposes of disposing of this issue whether failure to disclose affiliated bidder status renders the bid "nonresponsive" within the meaning of FAR § 14.301 as plaintiffs argue, or nonresponsible within the meaning of FAR § 9.1 as defendants argue. The relevance of such a distinction is discussed with respect to the standard commercial product clause, *infra*.

trol the other or (b) another concern controls or has the power to control both. In determining whether affiliation exists, consideration is given to all appropriate factors including common ownership, common management and contractual relationships...." Under SBA guidelines for determination of affiliation questions, one concern may be found to be controlling another through common management if, first, it is reasonable to conclude that under the circumstances one concern is directly influencing or has the power to direct or influence the operation of the other concern, and, second, one of the concerns is a "newly organized concern," related to the older concern according to the following description:

> Former officers, directors, principal stockholders, and/or key employees of one concern organize a new concern in the same or a related industry or field operation, and serve as its officers, directors, principal stockholders, and/or key employees, and one concern is furnishing or will furnish the other concern with subcontracts, financial or technical assistance, and/or facilities, whether for a fee or otherwise.

13 C.F.R. § 121.3(a)(vi)(C).[14]

With these principles as to what constitutes affiliation in mind, I will now summarize the evidence concerning TMI and Texas. Texas, located in Houston, TX, was formed in March 1985 and is a wholly owned subsidiary of International IMS, Inc. ("IMS"). IMS, in turn, is wholly owned by Joseph R. Bekker, who serves as President of Texas. TMI was incorporated in December 1985 and is located in Florida. Bert de Wys is the 85 percent owner of TMI and serves as its president and sole director. Rodney E. Lay is the secretary/treasurer and 15 percent owner of TMI. Thus, currently, the two firms share no common ownership, officers, or management.

In the past, however, there have been some connections between the firms and principals. De Wys was a principal or key employee at a distinct company, Thrustmaster, Inc. of Mississippi, prior to the formation of TMI in Florida. This company was also a marine thruster manufacturer. In October of 1984, IMS and Thrustmaster, Inc. of Mississippi signed an agreement linking the two firms in ongoing sales promotion and contract services to Exxon. The agreement has never been formally rescinded, and IMS continues with its work for Exxon. Thrustmaster, Inc. of Mississippi's contracts, however, were apparently discharged in bankruptcy. While TMI now also provides service work to Exxon, there was no indication that TMI and Texas continue to work together or on the same contracts for Exxon. In late 1984, de Wys approached Bekker looking for capital to refinance his Mississippi company, but Bekker was unwilling to assist de Wys after a review of the Mississippi company's debt situation. Thrustmaster, Inc. of Mississippi eventually filed for bankruptcy in May 1985.

De Wys was employed as an engineering consultant for Texas from April to October 1985. De Wys testified that he considered himself an officer, but not a key employee upon whom the survival or major part of the business of the firm depended. During this time period, de Wys provided technical assistance with Texas' bid package on a small 1400 pound thruster for the Army and the 4400 pound thruster Texas is now attempting to produce. De Wys' employment with Texas terminated in mid-October 1985 when he failed to move to Houston, as he earlier had agreed to, to begin regular employment at Texas. Instead, de Wys moved to Florida to form TMI. His employment thus ceased before either firm bid on the IFB at issue in this case.

In early December 1985, de Wys wrote to Frank Van Bentem, vice-president of Texas and a former employee of Thrustmaster,

**14.** While these regulations are used by the SBA to determine affiliation for questions of size status, the scheme has been relied on in other federal procurement matters. Indeed, the general definition of affiliates found in FAR § 19.-101 is virtually identical to that found in 13 C.F.R. § 121.3(a).

Inc. of Mississippi, and referred to the work he had previously done for Texas: "I understand that the Navy has awarded you the contract we bid on. I can help you if you so desire, but it would have to be with me out here." (Ex. 9). The plaintiffs point to this statement as evidence of continuing assistance between the two companies, but such a conclusion could only be pure speculation based on this one statement.

The last evidence the plaintiffs point to as proof of affiliation is that Texas represented Thrustmaster, Inc. of Mississippi products as its own in various sales literature presented to government officials.

I cannot find that these facts are sufficient to show that Texas and TMI control or have the power to control one another. At most, the evidence proves that the various principals of the firms had prior contact with one another and had, in the past, worked together on contracts involving thrusters. The evidence shows no current involvement between the firms, no collusion as to the bids in this case, no actual arrangements for subcontracting or financial/technical assistance. Indeed, the principals of the two companies credibly testified that they considered themselves competitors and that they were even on speaking terms for some time after de Wys left Texas' employment. The sparse evidence that plaintiffs point to as proof of control and affiliation simply is not enough to establish that TMI and Texas were anything but unaffiliated and independent entities. Thus, the contracting officer's determination that there was no substantial evidence of collusive bidding and affiliation is clearly supported by the testimony and exhibits presented in this action, and there was no need for either entity to identify the other as an affiliate.

*Standard Commercial Product Clause*

■ On Page C–3 of the IFB is found the standard commercial product clause which provides that:

The item furnish shall, as a minimum, be in accordance with the requirements of this specification and shall be the manufacturer's standard commercial product.

Additional or better features which are not specifically prohibited by this specification but which are a part of the manufacturer's standard commercial product, shall be included in the unit being furnished. A standard commercial product is a product which has been sold or is being currently offered for sale on the commercial market through advertisements or manufacturer's catalogs or brochures, and represents the latest production model.

The plaintiffs contend that TMI cannot supply a standard commercial product ("SCP") in compliance with this clause. They argue, therefore, that award of the contract to TMI was unlawful insofar as the defendants waived the SCP requirement by accepting a product which has not been proven by prior production and actual use in the field.

In reviewing this issue, I must first ascertain whether the Navy or the SBA makes the determination as to whether a particular firm has complied with the SCP clause.

FAR § 14.301, entitled "Responsiveness of bids" reads:

(a) To be considered for award, a bid must comply in all material respects with the invitation for bids. Such compliance enables all bidders to stand on an equal footing and maintains the integrity of the sealed bidding system.

(b) Telegraphic bids shall not be considered unless permitted by the invitation. The term "telegraphic bids" means bids submitted by telegram or by mailgram.

(c) Bids should be filled out, executed, and submitted in accordance with the instructions in the invitation. If a bidder uses its own bid form or a letter to submit a bid, the bid may be considered only if (1) the bidder accepts all the terms and conditions of the invitation and (2) award on the bid would result in a binding contract with terms and conditions that do not vary from the terms and conditions of the invitation.

A "responsiveness" determination is made solely by the contracting agency.

"Responsibility" is governed by FAR § 9.1. The general standards are set forth in FAR § 9.104–1:

> To be determined responsible, a prospective contractor must—
>
> (a) Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104–3(b));
>
> (b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;
>
> (c) Have a satisfactory performance record (see 9.104–3(c));
>
> (d) Have a satisfactory record of integrity and business ethics;
>
> (e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, and quality assurance measures applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (see 9.104–3(b));
>
> (f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104–3(b)); and
>
> (g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations. For standards pertaining specifically to construction and contracts, see Subparts 36.2, 36.3, and 36.4.

Responsibility determinations are made in the first instance by the contracting agency. In the case of a small business, however, a nonresponsibility determination is referred to the SBA. FAR §§ 9.104–3(e), 19.601; 15 U.S.C. § 637(b)(7)(A). If the SBA certifies the entity's responsibility, 15 U.S.C. § 637(b)(7)(A) directs the procuring agency to accept such certification as conclusive and directs that the contract be awarded without requiring the small business to meet any other requirement of responsibility or eligibility.[15] In essence then, the Navy would make the final determination of responsiveness in this case and the SBA makes the final determination of responsibility. Either decision is, of course, subject to judicial review.

The plaintiffs argue that compliance with the SCP clause is an issue of responsiveness because it concerns the history of the product itself, rather than the bidder's capability and experience which are issues of responsibility. According to the defendants, however, responsiveness is merely a promise by a bidder, contained within the four corners of the bid, that its bid complies with all material aspects of the solicitation; the contracting agency's only obligation in determining responsiveness is to see whether the bidder, as a matter of form only, meets the material requirement of the bid by supplying all the required information and by taking no exceptions to any of the solicitation's terms.[16] Responsibility, on the other hand, is determined after bid opening and involves an evaluation of capacity (plant, equipment, and personnel), capability (management and technical expertise), finances, resources, performance record, integrity, and delivery schedules.

I believe that the resolution of this issue is clarified by looking at the regulation governing rejection of individual bids because that regulation sets forth those things the agency must consider in making or rejecting a bid. That regulation is found at FAR § 14.404–2 and provides that:

> (a) Any bid that fails to conform to the essential requirements of the invitation for bids shall be rejected.
>
> (b) Any bid that does not conform to the applicable specifications shall be rejected unless the invitation authorized

---

**15.** *See* discussion at note 4, *supra.*

**16.** The various government witnesses referred to this sort of assessment as making sure the bidder had crossed all his "t"s and dotted his "i"s.

the submission of alternate bids and the supplies offered as alternates meet the requirements specified in the invitation.

(c) Any bid that fails to conform to the delivery schedule or permissible alternates stated in the invitation shall be rejected.

(d) A bid shall be rejected when the bidder imposes conditions that would modify requirements of the invitation or limit the bidder's liability to the Government, since to allow the bidder to impose such conditions would be prejudicial to other bidders....

(e) A low bidder may be requested to delete objectionable conditions from a bid provided the conditions do not go to the substance, as distinguished from the form, of the bid, or work an injustice on other bidders. A condition goes to the substance of a bid where it affects price, quantity, quality, or delivery of the items offered.

(f) Any bid may be rejected if the contracting officer · determines in writing that it is unreasonable as to price.

(g) Bids received from any person or concern that is suspended, debarred, or ineligible (see Subpart 9.4) shall be rejected if the period of suspension, debarment, or ineligibility has not expired as of the bid opening date.

(h) Low bids received from concerns determined to be not responsible pursuant to Subpart 9.1 shall be rejected (but if a bidder is a small business concern, see 19.6 with respect to certificates of competency).

(i) When a bid guarantee is required and a bidder fails to furnish a guarantee in accordance with the requirements of the invitation for bids, the bid shall be rejected, except as otherwise provided in 28.101–4.

\* \* \* \* \* \*

Because the language of most of these subsections is mandatory ("shall"), the con-

tracting agency *must* consider these things in evaluating a bid and before making a bid award.

As the government's interpretation of responsiveness and responsibility seems to require consideration of each of these items, I can accept that interpretation as reasonable and rational and therefore will defer to the agency's expertise in carrying out and defining its own regulations. *Campbell Co. v. Lloyd Wood Construction Co.*, 446 F.2d 261, 265 (5th Cir.1971). Under the government's interpretation of responsiveness, the contracting officer must make sure that the bidder meets the material requirements of the bid, conforms to the applicable specifications, conforms to the delivery schedule, takes no exceptions to or imposes no conditions modifying the bid requirements, and provides the required guarantees. All remaining checking into a bidder's suitability for award is made after bid award, in what the government characterizes as a "responsibility" determination. This determination involves an assessment of whether the bidder has the apparent ability to meet successfully the requirements of the contract and would involve an evaluation of those remaining items stated in subsections (g) and (h).

Based on this construction of responsiveness and responsibility, the government, persuasively, claims that the issue of compliance with the SCP clause is an issue of responsibility, because it goes to TMI's ability and capacity to provide the specifications required by the IFB. Indeed, Comptroller General decisions have consistently treated questions involving the SCP clause as issues of responsibility. *E.g., Clausing Machine Tools*, B–216113, May 13, 1985, 85–1 CPD 533; *Harnischfeger Corp.*, B–211313, July 8, 1983, 83–2 CPD 68; *Schreck Industries, Inc.*, B–204050, July 6, 1982, 82–2 CPD 14. And the SBA also considers SCP-clause compliance as within its assessment of responsibility.[17] While

17. Farrow, the Navy contracting officer, indicated that he considered evaluation of SCP-clause compliance as within his sphere of duties. However, the initial responsibility de-
termination must in the first instance be made by the contracting agency, so his testimony is not inconsistent with a conclusion that this issue is one of responsibility.

the plaintiffs are correct that the SCP clause is a part of the military specifications in the IFB, the responsibility determination of whether a firm *can provide* a product as specified is a separate determination from that made at the responsiveness review of whether the firm has *represented* that it *will meet* all specifications. The question of ability to produce the specified unit, including whether the firm can produce an SCP, within the meaning of the clause in the IFB, is best seen as an issue of responsibility.

More important than whether compliance with the SCP clause is an issue of responsiveness or responsibility is whether compliance was indeed checked at some stage in the pre-award process. Because I have determined that SCP–clause compliance is a responsibility issue, it should have been evaluated first by the Navy, the contracting agency, and then, if the need arose, by the SBA. The evidence is undisputed that the Navy made no actual assessment as to TMI's ability to comply with the SCP clause; the DCAS preaward survey indicated only that TMI had no current production and that it had not produced the bid item previously. They, therefore, totally failed in their duties of monitoring SCP-clause compliance.

The SBA investigative officer (Seacrest) did, however, give at least some consideration to SCP-clause compliance in his responsibility assessment. He testified that he gave a "cursory review" to that issue by asking the firm whether it had produced the identical item before, whether it had produced similar items within the same product line, and whether it had company brochures and advertising documents substantiating the firm's normal product lines. While the firm had never produced the identical item before, TMI told Seacrest

that it had produced similar items within the same product line and presented him with a general flyer advertising its thruster propulsion systems for use in the marine industry. Seacrest believed these two statements were sufficient to fit TMI within the "currently offered for sale" provision of the SCP clause. Seacrest also testified that his consideration of SCP clause compliance was relegated to a secondary basis as the Navy had not specifically referred a negative SCP-clause compliance determination to it (as had been done with Walsh-Healy Act compliance) and because the SBA's primary responsibility in the COC program is to determine whether the firm can provide the manufactured product to the government in a timely manner. Seacrest regarded the SCP-clause as a mere "qualifying" clause irrelevant to his primary evalution of whether TMI could build the thrusters and build them on time. He did not believe that SCP-clause compliance was relevant to TMI's technical capability.

The plaintiffs contend that this cursory consideration by SBA does not satisfy SBA's obligations to ensure that TMI can meet the specifications of the IFB, one of which is provision of an SCP. Further, plaintiffs claim that TMI *cannot* meet the requirements of the SCP clause.

The plaintiffs argue for a very strict interpretation of the SCP clause. They contend that a firm must virtually be able to provide an off-the-shelf item to comply with that clause. As support for their argument, they point out that the SCP-clause in the IFB was explicitly altered so as to delete portions which had previously permitted additional features to be added to an SCP and defined an SCP as a product to be sold sometime in the future in the commercial market.[18]

---

**18.** The SCP-clause, before modification provides as follows:

> *Standard commercial product.* The propelling unit shall, as a minimum, be in accordance with the requirements of this specification and shall be the manufacturer's standard commercial product *with any added features needed to comply with the requirements.* Ad-

ditional or better features which are not specifically prohibited by this specification, but which are a part of the manufacturer's standard commercial product shall be included in the propelling unit being furnished. Standard commercial product is a product which has been *or will be sold* on the commercial market through advertisements or manufacturer's

I cannot interpret the clause as strictly as the plaintiffs would like, however. Despite the deletions made in the original SCP-clause, it would produce an absurd result to define an SCP so as to require that bidders produce or supply the *exact* product that is offered commercially; such a definition would effectively require an off-the-shelf product, which is not what has been requested in this solicitation. And such a definition would limit consideration of the bid to the only firm which has previously produced this exact model thruster for the Navy—Ulstein Maritime. Even Schottel, the other plaintiff in this action, admitted that it would have to do some redesign and modification to its 7500 pound thrusters to comply with the military specifications.

Further, the SCP-clause clearly states that the product can be one which "is currently being offered for sale," so that production of the item in the past cannot be the sole criterion for satisfaction of the SCP clause. I simply find plaintiffs' position as to the meaning of the SCP-clause untenable. While the phrase allowing addition of added features was deleted, this deletion does not necessarily mean that no modifications whatsoever could be made to an existing product in order for it to constitute an SCP. One would need to be a mindreader in order to advertise the exact item the Navy sought *prior* to its IFB. And such an interpretation would undermine the goals of the Competition in Contracting Act by foreclosing all new or potential entrants from competing in this field and would exclude new products or small businesses as well. A sensible interpretation of the SCP-clause, therefore,

must leave to the procuring agency and the SBA flexibility in deciding how broad the definition of SCP is. For example, it would seem reasonable to interpret the clause so as to qualify a firm which has produced, supplied or advertised a product with sufficient horsepower engine to generate the pounds of thrust required by the IFB. What is required is simply an informed judgment regarding product specifications and capabilities. As stated by the Comptroller General in *Clausing Machine Tools*, B–216113, May 13, 1985, 85–1 CPD 533:

> a commercial product requirement in the specifications is not a definitive criterion of responsibility, but is like any other specifications requirement bearing on the product to be furnished—the bidder or offeror must commit itself to meeting the specification requirements, but its ability to do so is encompassed by the contracting officer's subjective responsibility determination. . . .

I reject, therefore, the plaintiffs' stricter approach which would require that a bidder possess the precise product solicited in the bid before it could be deemed to have satisfied this clause.[19]

I believe, however, that in this case compliance with the SCP-clause was not even sought. The Navy admittedly made no assessment of SCP-clause compliance despite the fact that the SCP-clause is part of the product specification. The SBA, while supposedly giving cursory review to SCP-clause compliance, I believe in reality, gave only an after-the-fact, off-handed assessment of whether TMI met this part of the specification. The SBA accepted without question as evidence of "current offering

---

catalogs, or brochures, and represents the latest production model(s). (emphasis added). The reason for these modifications in the SCP-clause is unknown. The plaintiffs contend that they are a result of implementation of the policies articulated by the Competition in Contacting Act amendments to 10 U.S.C. § 2301, Pub.L 98–369, § 2721, 98 Stat. 1185, 1186. These amendments direct that procurement policies and procedures for the Navy shall "promote the use of commercial products whenever practicable." 10 U.S.C. § 2301(b)(6). The goal of these amendments is probably reflective of a combi-

nation of factors such as a desire to use products already tested in the commercial market and a desire that the various armed services agencies save money by purchasing products already existing, rather than needing to be developed.

**19.** Indeed, the *Clausing Machine Tools* opinion explicitly rejected the earlier approach advocated by the plaintiffs and endorsed in some earlier Comptroller General decisions as simply too restrictive.

for sale" a one-page flyer which describes TMI's ability to produce all manner of thruster propulsion systems. With all due deference to both agencies and their expertise in determining SCP-clause compliance, I find that they at least must make some sincere inquiry into whether a bidder is capable of complying with the specifications in the IFB, including the SCP clause, as the regulations require rejection if the specifications cannot be met. FAR § 14.-404–2(b). Although a subjective responsibility determination involves consideration of a number of factors and permits flexibility on the part of the reviewing agent, the factors must at least be seriously and meaningfully evaluated or the regulations have been effectively ignored. Failure of the agencies to follow their own regulations is grounds for a court to set aside their actions. *See e.g., Robert E. Derecktor of Rhode Island, Inc. v. Goldschmidt,* 506 F.Supp. 1059, 1063 (D.R.I.1981).

*SBA Issuance of COC*

As discussed in the factual findings above, based on its pre-award survey of TMI, NAVFAC concluded that no award should be made to TMI because it deemed the firm to be nonresponsible. Its conclusion was based on two factors: TMI lacked satisfactory production capability, and it failed to meet the requirements of the Walsh-Healey Public Contracts Act. The SBA, in effect, overturned this finding of nonresponsibility by its issuance of a COC. The SBA Industrial Specialist made a contrary determination that TMI could comply with Walsh-Healey and certified that from a capacity standpoint TMI was a responsible firm. The plaintiffs and Texas now contend that issuance of the COC by the SBA was arbitrary and capricious and in violation of applicable law and regulations, particularly those governing Walsh-Healey compliance.

The Walsh-Healey Public Contracts Act, 41 U.S.C. §§ 35–45, requires that each government contract for the manufacture or furnishing of materials and goods in an amount over $10,000 contain representations and stipulations that the contractor is a regular manufacturer or dealer, that all its employees will be paid at least the minimum wage, that its employees will be paid overtime when they work over eight hours a day or forty hours in a week, that neither child nor convict labor will be used, and that working conditions for its employees will be safe and sanitary. 41 U.S.C. § 35. The Act is applicable to the solicitation in this case because the contract price exceeds $10,000 and no statutory or regulatory exemption applies.[20]

■ The purpose of Congress in enacting Walsh-Healey "was to impose obligations upon those favored with government business and to obviate the possibility that any part of our tremendous national expenditures would go to forces tending to depress wages and purchasing power and offending fair social standards of employment." *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 128, 60 S.Ct. 869, 877, 84 L.Ed. 1108 (1940). The purpose of Congress in enacting the particular requirement primarily at issue here, that the contractor be a regular manufacturer or dealer, was to restrict the bounty of government contracts to established manufacturers and dealers because they are most likely to effect Walsh-Healey goals of maintaining high labor standards in connection with wages and conditions. *Cf. Steuart Petroleum Co. v. United States,* 438 F.Supp. 527 (D.D.C.1977) (discussing purpose as relates to regular dealer).

The regulations implementing Walsh-Healey are promulgated and interpreted by the Department of Labor. 41 U.S.C. § 38. These regulations, as well as the general principles of the Act, must be followed by the SBA in its determination of whether to issue a COC respecting Walsh-Healey eligibility. This fact is clear from the legislative history of 15 U.S.C. § 637(b)(7)(B) which gave the SBA the authority to issue COC's as to Walsh-Healey eligibility.[21]

---

**20.** The IFB at page I–26 incorporates the contract clauses required by Walsh-Healey.

**21.** See note 4 above.

The House Conference Report on this provision states:

> In agreeing to the House-passed version of amendments to section 8(b)(7) of the Small Business Act, the Conferees do so with the understanding that the Small Business Administration shall conscientiously administer and enforce the rules and regulations promulgated by the Department of Labor that pertain to the Walsh-Healey Public Contracts Act when certifying as to whether a small business concern meets the provisions of section 35(a) of title 41, United States Code.

House Conference Report No. 95–535, July 26, 1977, p. 21, U.S.Code Cong. & Admin. News 1977, pp. 821, 851; *see also* 41 C.F.R. § 50–201.101(b)(6)(i)(c)(2) ("The Small Business Administration is bound by the regulations and interpretations of the Department of Labor in making its determinations of eligibility under the [Walsh-Healey] Public Contract Act.").

Of relevance here are the Walsh-Healey regulations setting forth the requirements for a firm to be considered a manufacturer or dealer. TMI was considered a newly organized manufacturing firm and therefore must be evaluated for compliance with 41 C.F.R. § 50–206.51(b)(2): [22]

> *A bidder who desires to qualify for an award as a manufacturer must show before the award that ... (2) if the bidder is "newly entering" into such manufacturing activity that the bidder has made all necessary prior arrangements and definite commitments for (i) manufacturing space, (ii) equipment, and (iii) personnel to perform on its own premises the manufacturing operations required for the fulfillment of the con-*

tract. A new firm which, prior to the award of a contract, has made such definite prior arrangements and commitments in order to enter a manufacturing business which will qualify it should not be barred from receiving the award because it has not yet done any manufacturing, even if such arrangement and commitments are contingent upon the award of a Government contract. However, *in order to meet the "definite commitment" test for "newly entering" firms, the bidder must have entered into written, legally binding arrangements and commitments prior to, even though contingent upon, award, under which the bidder would acquire for itself plant, equipment and personnel if awarded the Government contract.* (Emphasis added.)

Thus, the key to the assessment of whether an entity qualifies as a newly entering manufacturer is the presence of "prior arrangements and definite commitments." While "[t]he documentation required to evidence prior arrangements will vary depending upon the facts and circumstances of the particular case, [t]he contents and bona fides of all documentation and arrangements must be examined to determine if the spirit and intent of the Act and regulations have been met." 41 C.F.R. § 50–206.51(c)(2).

The Department of Labor gives examples of what it considers is and is not adequate evidence of the requisite arrangements and commitments: where the lease of manufacturing space is involved, the lease agreement must "clearly identif[y] the manufacturing space and se[t] forth the terms and conditions of the lease," § 50–206.51(c)(2)(i);

---

22. TMI was also evaluated as a newly entering assembler:

> .... A firm which produces final items on its premises by assembling component parts, all or some of which have been purchased from others, will generally be considered to be a "manufacturer" where it performs a series of assembly operations utilizing machines, tools and workers which constitute substantial and significant fabrication or production of the desired product. The qualifications of a bidder as a manufacturer who proposes to

"assemble" must be decided on the basis of all the facts and circumstances surrounding a particular procurement.

41 C.F.R. § 50–206.52(b)(1). Further, to qualify as an assembler the bidder must have demonstrated "an independent ability, with its plant, equipment, and personnel, to perform a significant or substantial portion of the manufacturing operations and efforts required in producing the final product...." 41 C.F.R. § 50–206.52(b)(2).

the lease agreement must be "legally binding on the part of both parties to the agreement, the space must be for the exclusive and unrestricted use of the lessee, and the term of the lease must be of sufficient duration so that the bidder will be able to clearly fulfill the contract before the lease expires," *id.;* "a bidder's arrangements to use, rent, or share the equipment, personnel, or space of another legal entity on a time and material or 'as needed' basis do not constitute the making of all necessary prior arrangements or definite commitments.... The Department has consistently held that the availability of the manufacturing and producing establishments of others does not qualify the contractor as the term is defined herein," § 50–206.51(e) (citations omitted); "Activities such as engineering, planning, design, inspection, quality control, testing, marking, packaging, and repackaging and shipping may be incidental, ancillary or necessary to manufacturing. Nevertheless, such operations are not, standing alone, or in combination, considered 'manufacturing,' i.e., fabrication or production. The proposed performance solely of such activities does not qualify a firm as a manufacturer," § 50–206.51(h).

NAVFAC, based on the DCAS pre-award survey, concluded that TMI could not satisfy these Walsh-Healey regulations. Specifically, the report indicated that TMI was only assembling a small portion of the bid item at its facility, while the balance was to be subcontracted out to North Florida Shipyard; that TMI's lease of space from Rodney E. Lay & Associates had an "as required" provision in it; that final assembly and all subassembly contracts but two were to be performed by North Florida Shipyard; that TMI lacked the equipment, personnel and facilities to perform the final end item assembly.

DCAS assistant counsel John M. Campbell concluded that TMI was neither a "newly entering" manufacturer nor a "manufacturer/assembler." It lacked the personnel, space, tooling, etc. to produce the outboard propelling units even with the assistance of Rodney E. Lay & Associates

and North Florida Shipyard, and the arrangements for item on an "as needed basis" placed TMI outside the applicable definitions. He also noted that activities such as engineering, planning, design, quality control, testing, etc., are not considered manufacturing. TMI could similarly not be judged an assembler because it was performing very little of the assembly effort using its own leased premises, workers and tools. Instead, the overwhelming portion of the required assembly was subcontracted out to North Florida Shipyard.

Seacrest at the SBA made a very different determination; he concluded that TMI could comply with the Walsh-Healey manufacturer/assembler requirements. He found that the corporate charter had been filed for the expressed purpose of providing services and equipment to the marine industry; that a two-year lease was executed with North Florida Shipyard, commencing on March 17, 1986, to be used exclusively by TMI for performing final assembly of the propelling unit; that design, engineering, purchasing, contract administration, and some subassembly fabrication and assembly would be performed at facilities leased from Rodney E. Lay & Associates; that TMI had a one-year lease for facilities, commencing on December 13, 1985, with an open end renewal option, from Rodney E. Lay & Associates; that the space leased from Rodney E. Lay & Associates was equipped with machinery and tools owned by TMI for the manufacture/assembly of marine equipment for Exxon Shipping Co.; that employment agreements had been consummated; that all of these arrangements were not made solely for the purpose of performing the government award under review; and that TMI would be performing more than minimal tasks, i.e., design, engineering, purchasing, contract administration, testing, packaging, and some fabrication, subassembly and final assembly.

In the interim between the DCAS pre-award survey and the SBA issuance of a COC, TMI attempted to act so as to meet the requirements of Walsh-Healey. Specif-

ically, it tried to conform and execute two leases, that with Rodney E. Lay & Associates and that with North Florida Shipyards, so as to satisfy the definite and binding commitments language of the Walsh-Healey regulations. The leases, as executed and complied with to date, are therefore essential to the determination of whether TMI satisfies Walsh-Healey. It is clear, however, that both leases do not comply with the Walsh-Healey mandate that a newly entering firm have the necessary arrangements and definite commitments.

The concern stated in the Walsh-Healey regulations is that leases or contingent arrangements be *legally binding;* only then is there assurance that a bidder is not totally subcontracting out the manufacture of the product. With respect to the Rodney E. Lay & Associates lease, the executed agreement indicates that Rodney E. Lay & Associates leased 200 square feet of space, "or as is required" to TMI for use as office, not manufacturing, space. The terms of the lease also required monthly rental of $150 beginning in December 1985, but only one payment had been made during the period from December 13, 1985 to July 2, 1986. And the lease contained a termination for nonpayment of rent provision. Seacrest, the SBA Industrial Specialist, testified that he knew of at least some of these defects in the lease arrangement— the "as required" language and the provision only for office space. Yet, he also believed that Walsh-Healey was satisfied without written, legally binding commitments, because he was confident that, if he had so requested, Rodney E. Lay & Associates and TMI would have altered the lease as necessary.

The lease with North Florida Shipyard is similarly defective. It was entered into only after the DCAS pre-award survey, where it was found that most of the manufacturing and assembly of the thrusters was to be conducted by North Florida Shipyard. The lease terms were for "1,000 sq. ft. [of space], more or less, as required to manufacture propelling units" for a two-year period beginning March 17, 1986.

Rental payments were stated as $1,000 per month beginning on the same date. De Wys, president of TMI, understood the "as required" language in the lease to mean that TMI was permitted to use and pay for space only as and when needed by TMI for manufacturing marine propelling units. Further, when Seacrest visited the leased premises, he found that TMI did not occupy the premises, had not even left any tools there, but the space was instead occupied by North Florida Shipyard for storage. The SBA investigator also was informed that no rental payments had yet been made by TMI under the provisions of the lease, but that one would be made in the near future. Although Seacrest was aware of these defects, he again believed, without even asking, that the lease terms would have been modified to comport with Walsh-Healey if he so requested.

Again, the lease does not reflect the binding commitments mandated by Walsh-Healey. The lease is on an "as needed" basis, the rent has not been paid despite the terms of the lease, the premises are not for TMI's exclusive use. And without a binding lease, it is clear that TMI is not the entity which is acting as the manufacturer or assembler.

 The Walsh-Healey regulations do make provisions for newly entering manufacturers to comply with its terms. In order to do so, however, the firm *must have* the necessary arrangements and commitments. The regulations do not preclude arrangements contingent upon award, but do require that a firm be a genuine manufacturer and not a mere subcontractor. Those are the purposes and unequivocal direction of the regulations, and the SBA cannot waive the Walsh-Healey requirements for small businesses even if it can help them meet the requirements. Congress directed that SBA apply the regulations conscientiously, and not exempt small businesses from the regulations while all others are bound by them. In this instance, it is clear that the SBA acted contrary to applicable law and regulation in

issuing the COC as to Walsh-Healey compliance; TMI admittedly lacked the necessary binding, legal commitments required by the regulations and waiver of those regulations is not within the SBA's discretion.[23] Accordingly, the COC must be set aside on this basis as well.

*Conclusion*

Because of my conclusion on the SCP-clause compliance issue and the Walsh-Healey compliance issue, the COC issued by the SBA must be set aside as in clear and prejudicial violation of the applicable regulations. The matter is remanded to the Navy for consideration of the next low bid.[24]

23. A number of other defects in the issuance of the COC have also been raised by the parties—material misrepresentations made by TMI, lack of adequate equipment, and employees—but need not be addressed because of my disposition on the binding commitments issue.

24. If the only error made by the SBA in issuing the COC was as to SCP-clause compliance, then TMI's bid could still be considered for award as the basis for set aside on that ground was the total lack of evaluation by the Navy and SBA. But on the Walsh-Healey compliance issue, the SBA conducted its evaluation, but in doing so, illegally waived compliance with the applicable regulations.